# ADIRONDACK RAILWAY COMPANY v. NEW YORK STATE.

ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

No. 439. Argued January 15, 16, 1900. — Decided February 26, 1900.

While the legislative power to amend or repeal a statute cannot be availed of to take away property already acquired, or to deprive a corporation of fruits of contracts lawfully made already reduced to possession, the capacity to acquire land by condemnation for the construction of a railroad attends the franchise to be a railroad corporation; and, when unexecuted, cannot be held to be in itself a vested right surviving the existence of the franchise, or an authorized circumscription of its scope.

The highest court of the State of New York having held that there is no property in a naked railroad route in that State which the State is obliged to pay for when it needs the land covered by that route for a great public use, and its officers are by appropriate legislation authorized to act, this court accepts the views of that court, and thinks that the proceedings on the part of the State which are complained of in this case, impaired the obligation of no contract between it and the railway company.

The necessity or expediency of appropriating particular property for public use is not a matter of judicial cognizance, but one for the determination of the legislative branch of the Government; and this must obviously be so when the State takes for its own purposes.

THIS was a writ of error to a judgment of the Court of Appeals of the State of New York affirming a final judgment of the Supreme Court of New York perpetually enjoining the Adirondack Railway Company from taking certain lands by condemnation proceedings. The People of the State of New York brought the action and obtained judgment at a special term of the Supreme Court, which was reversed by the Appellate Division, 39 App. Div. 34; whose order was in turn reversed by the Court of Appeals, and the original judgment affirmed. 160 N. Y. 225.

The case is thus stated in the opinion of the Court of Appeals by Vann, J.:

"In 1882 the Adirondack Railway Company was incorporated for the term of one thousand years to construct and operate a railroad from Saratoga Springs to the river St. Lawrence, near the city of Ogdensburg. It was a reorganization of an older corporation known as the Adirondack Company, which was organized in 1863, under the provisions of chapter 236 of the laws of that year. Prior to the foreclosure which resulted in the reorganization, the Adirondack Company had constructed a railroad from Saratoga Springs to North Creek, in the county of Warren, and this railroad, together with the right to extend the same, became the property of the Adirondack Railway Company, which, in April, 1892, applied to the railroad commissioners for a certificate, under chapter 565 of the laws of 1890, to relieve it from the statutory obligation of extending its lines; on the 9th of May following, the commissioners issued their certificate accordingly. The Adirondack Railway Company, thenceforth called the defendant, made no attempt to extend its road until the early part of 1897, when a survey was made for a proposed extension from North Creek through the counties of Warren, Hamilton and Essex, to the outlet of Long Lake in Hamilton County, where it was expected that, by connecting with other roads, a route would be secured to the St. Lawrence River. Before anything further was done to extend the road, certain action, taken by the State, should be briefly alluded to.

"In 1885 the forest preserve was created by statute, embrac-

ing 'all the lands now owned, or which may be hereafter acquired by the State of New York within' certain counties, and the area was extended by subsequent legislation. (L. 1885, ch. 283; L. 1887, ch. 639; L. 1893, ch. 332.) These acts required said lands to be forever kept as wild forest lands, and provided that they should not be sold, leased or taken by any corporation, public or private. A forest commission with appropriate powers was created to care for the forest preserve, and appropriations were made from time to time to enable it to properly discharge its duties.

"In 1890 the forest commission was authorized to 'purchase lands so located within such counties as include the forest preserve, as shall be available for the purposes of a state park,' and in 1892 the Adirondack park was established and placed under the control of said commission. (L. 1890, ch. 37; L. 1892, ch. 707.)

"The revised constitution, which went into effect on the 1st of January, 1895, provides that 'the lands of the State, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed.' (Const., art. 7, § 7.)

"In 1895 the legislation relating to the forest preserve and the Adirondack park was extended by the fisheries, game and forest law, and it was declared by section 290 that 'such park shall be forever reserved, maintained and cared for as ground open for the free use of all the people for their health and pleasure and as forest lands necessary to the preservation of the headwaters of the chief rivers of the State, and a future timber supply; and shall remain part of the forest preserve.' (L. 1895, ch. 395, §§ 270, 295.) During the same year the forest commission was authorized to purchase 80,000 acres for the use of the Adirondack park. (L. 1895, ch. 561.) In 1897 an act was passed, the object of which, according to its title, was 'to provide for the acquisition of land in the territory embraced in the Adirondack park, and making an appropriation therefor.' (L. 1897, ch. 220.) By this act the appoint-

ment of a forest preserve board was authorized, and it was made its duty ' to acquire for the State, by purchase or otherwise, land, structures or waters, or such portion thereof in the territory embraced in the Adirondack park, as defined and limited by the fisheries, game and forest law, as it may deem advisable for the interests of the State.' Section 3 of said act provides that ' the forest preserve board may enter on and take possession of any land, structures and waters in the territory embraced in the Adirondack park, the appropriation of which in its judgment shall be necessary for the purposes specified in section 290 of the fisheries, game and forest law, and in section 7 of article 7 of the constitution.' It is provided by the next section that ' upon the request of the forest preserve board an accurate description of such lands so to be appropriated shall be made by the state engineer and surveyor, or the superintendent of the state land survey, and certified by him to be correct, and such board or a majority thereof shall indorse on such description a certificate stating that the lands described therein have been appropriated by the State for the purpose of making them a part of the Adirondack park ; and such description and certificate shall be filed in the office of the Secretary of State. The forest preserve board shall thereupon serve on the owner of any real property so appropriated a notice of the filing and the date of filing of such description, and containing a general description of the real property belonging to such owner which has been so appropriated ; and from the time of such service, the entry upon and appropriation by the State of the real property described in such notice for the uses and purposes above specified shall be deemed complete, and thereupon such property shall be deemed and be the property of the State. Such notice shall be conclusive evidence of an entry and appropriation by the State. § 4. Provision is made by the next section for the payment for lands so taken and for damages resulting from the appropriation by agreement with the owner and the delivery of a certificate payable by the state treasurer upon the warrant of the comptroller. § 5. If the forest preserve board is unable to agree with the owner upon

the value of the property appropriated, the owner, within two years after the service upon him of the notice of appropriation, may present a claim for the value of the land to the Court of Claims, which has jurisdiction to hear and determine the same and to render judgment thereon. The amount of the final judgment is payable to the treasurer upon the warrant of the comptroller. § 6. No provision is made by the act for the payment of any lien upon the lands except that when a judgment for damages is rendered and it appears that there is a lien or incumbrance upon the property appropriated, the amount thereof shall be stated in the judgment and the comptroller may deposit the amount awarded in the proper bank to be paid and distributed to the persons entitled to the same as directed by the judgment. § 19. The sum of $600,000 was appropriated for the purposes specified in the act, and the comptroller was authorized to borrow $400,000 more upon the request of the forest preserve board to be expended under its direction.

"On the 6th of August, 1897, after certain negotiations with the owners of a part of an extensive tract of land known as the Totten & Crossfield purchase, the forest preserve board passed a resolution accepting the offer of the owners of about 18,000 acres of township 23, and 32,000 acres of township 15 of that purchase for the sum of $149,000, of which $99,000 was for the land and $50,000 was for certain improvements at Indian Lake for the use of the State, to be made in accordance with the plans and specifications to be furnished by the state engineer. Township 15 of the Totten & Crossfield purchase lies, as is admitted in the answer, 'wholly within the bounds of the forest preserve and also of the Adirondack park.' Upon the 15th of August, 1897, a representative of the state engineer with a surveying party began surveying at Indian Lake for the purpose of constructing a dam at its mouth in order to stow water for the use of the Champlain Canal and for water power on the Hudson River. Upon the completion of the survey plans and specifications were prepared and the construction of the dam was commenced.

"September 18, 1897, the defendant caused a map and pro-

file to be filed in the counties of Hamilton, Warren and Essex for the extension of its road across township 15, which the forest preserve board had agreed to purchase as aforesaid, and which lies partly in each of said three counties. It also gave notice of such filing to the occupants as required by statute, but did nothing else. About the 1st of October following, as the owners were about to convey to the State the lands covered by the resolution of August 6th, and receive their money, they were restrained from so doing by an injunction issued in an action brought by the Adirondack Railway Company against them. Thereupon they placed the deed *in escrow* to be delivered when the injunction was dissolved, made another deed embracing the same premises, except the land described in the railroad survey, delivered it to the forest preserve board, and received the $99,000, according to agreement. Immediate steps were taken to vacate the injunction, but they were not at first successful, and on the 7th of October the forest preserve board met, and learning that the justice who granted the injunction had declined to vacate it, they took steps to appropriate the land in question for a park under the power of eminent domain. The state engineer having furnished a description in writing of the six-rod strip, which the defendant desires for a railroad, and certified that the same was correct, the three members of the forest preserve board, acting under chapter 220 of the Laws of 1897, annexed thereto a certificate of condemnation and signed the same as the forest preserve board, in these words: 'State of New York, county of Albany, city of Albany, *ss.* We, Timothy L. Woodruff, Charles H. Babcock and Campbell W. Adams, being the forest preserve board, acting under and in pursuance to an act of the legislature of the State of New York, being chapter 220 of the Laws of 1897, entitled "An act to provide for the acquisition of land in the territory embraced in the Adirondack park and making an appropriation therefor," do hereby certify that the lands in township 15, Totten & Crossfield purchase, in the counties of Hamilton, Essex and Warren, of the State of New York, described in the foregoing certificate of the state engineer, have been and hereby are

duly appropriated by the State of New York for the purpose of making them a part of the Adirondack park.' These papers, indorsed 'state engineer's certificate and description and forest.preserve board's certificate of condemnation,' were filed in the office of the secretary of state on the 7th of October, 1897. On the same day a notice of this action of the board, with a general description of the property appropriated and a copy of the papers above mentioned, were served on William McEchron, the president of the Indian River Company, which then owned the lands involved. This service was made, as the special term is presumed to have found, at ten minutes before noon. On the same day the defendant began proceedings to condemn said strip for the purpose of extending its railroad, but as the special term is also presumed to have found, they did not file the *lis pendens* until afternoon, and hence not until after the aforesaid proceeding in behalf of the State had been completed. No notice of condemnation was served on the defendant.

"On the 2d of March, 1898, the injunction restraining the conveyance of said lands to the State was reversed on appeal by the appellate division, and thereupon the original deed *in escrow* was delivered and recorded. The defendant went on with its condemnation proceedings until it was restrained by a temporary injunction granted in this action, which was brought to restrain that company and the other defendants from further continuing the proceedings to condemn.

"The defendant alone answered, and after a trial the special term rendered judgment for the People, perpetually enjoining it from taking the land. Upon appeal the judgment was reversed by the appellate division and a new trial ordered, by a divided vote, upon the ground that the company, by the filing of its map on the 18th of September, had impressed upon the land a lien that was good as against the State of New York. The People have appealed to this court, giving the usual stipulation for judgment absolute."

*Mr. R. Burnham Moffat* for plaintiff in error.

*Mr. Edward Winslow Paige* for defendant in error.

MR. CHIEF JUSTICE FULLER, after making the above state-ment, delivered the opinion of the court.

The Court of Appeals ruled that on the record it must be presumed that all the facts warranted by the evidence and necessary to support the judgment were found by the courts below; that it was to be assumed that the condemnation proceedings instituted by the forest preserve board were fully completed as required by the statute of 1897 before proceedings to condemn on its part were commenced by the railroad company; and that, thereby, if the condemna-tion act under which the board proceeded was valid, title to the strip of land in question passed to the State, became a part of the forest preserve, and the railroad company was forbidden by the Constitution to take it. The court sustained the validity of the law, and, without discussing " whether the State became the equitable owner through contract, posses-sion and performance," held that " it became the legal owner through the power of eminent domain."

Plaintiff in error contends, in substance : that it possessed by contract a vested right to construct its road over the six-rod strip in question, and to take that strip by the exercise of the power of eminent domain, and that the condemnation features of the act of 1897, as construed by the Court of Appeals, are void because impairing the obligation of the contract; that the condemnation features of the act as construed to confer authority on the State to acquire, by the proceedings in ques-tion, title to the six-rod strip are unconstitutional and void in that they authorize the taking from plaintiff in error its vested property right to construct, maintain and operate its railroad over said strip, " without any notice whatsoever or opportunity to be heard, and without the making of any compensation therefor; " that the proceedings authorized by the act of 1897 do not constitute due process of law.

Section 1 of Article VIII of the constitution of New York authorized the formation of corporations under general laws, and by special act (for municipal purposes and) in cases where in the judgment of the legislature the objects of the corpora-

tion could not be attained under general laws, but provided that "all general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

The Adirondack company was organized in 1863 under the general railroad law of New York of April 2, 1850, which reserved the right of the legislature to "at any time annul or dissolve any incorporation formed under this act."

The Revised Statutes, in force from 1829 to 1882, provided: "The charter of every corporation that shall hereafter be granted by the legislature, shall be subject to alteration, suspension and repeal, in the discretion of the legislature."

By an act of March 31, 1865, the Adirondack company was authorized to "amend its articles of association so as to enable it, under the general law, to extend its railroad to some point on Lake Ontario or river St. Lawrence."

April 25, 1867, the railroad law of April 2, 1850, was amended so as to provide that if corporations formed under the act should not within five years after the filing and recording of its articles of association commence construction or finish its road and put it in operation within ten years, its corporate existence and powers should cease.

In 1882 the railroad of the Adirondack company extended from Saratoga Springs to North Creek, and in that year the Adirondack railway company acquired all the rights of the Adirondack company, and, under the reorganization laws of New York, organized itself with a life of a thousand years.

The eighty-third section of the railroad law of June 7, 1890, provided as follows: "A railroad corporation, reorganized under the provisions of law, relating to the formation of new or reorganized corporations upon the sale of their property or franchise, shall not be compelled or required to extend its road beyond the portion thereof constructed, at the time the new or reorganized corporation acquired title to such railroad property and franchise, provided the board of railroad commissioners of the State shall certify that in their opinion the public interests under all the circumstances do not require such extension. If such board shall so certify and shall file in their office such certificate, which certificate

shall be irreversible by such board, such corporation shall not be deemed to have incurred any obligation so to extend its road, and such certificate shall be a bar to any proceedings to compel it to make such extension, or to annul its existence for failure so to do, and shall be final and conclusive in all courts and proceedings whatever. This section shall not authorize the abandonment of any portion of a railroad which has been constructed or operated or apply to Kings County."

On the ninth of May, 1892, on the application of the Adirondack railway company, the board of railroad commissioners issued its certificate, certifying that in its opinion the public interests, under all the circumstances, did not require the extension of the road of the Adirondack railway company beyond the portion thereof constructed at the time the said company acquired title to said railroad property and franchises, namely, beyond North Creek, in the county of Warren.

Counsel argue that the contract with the State was that plaintiff in error should avail itself of the grant and complete the road within ten years from the filing of its articles of association, or forfeit its existence and powers; that this was one of the conditions of the contract; that it was perfectly competent for the State to release the other party from the fulfilment of such condition without in any way withdrawing its own grant if it chose to do so; and that this was the sole effect of the application for and the obtaining of the certificate. In other words, that the Adirondack railway company was released from the obligation to extend its road, but retained the right to do so at any time within nine hundred and ninety years, and that although the company still possessed and operated the road so far as constructed, and had asked and received a dispensation from carrying its enterprise further except as it might choose during the passage of centuries, the State was bound by contract not to withdraw the bare right, notwithstanding the contract, according to its express terms, might be changed or abrogated.

Undoubtedly the power to amend or repeal cannot be availed of to take away property already acquired or to deprive a cor-

poration of the fruits already reduced to possession of contracts lawfully made. But the capacity to acquire land by condemnation for the construction of a railroad attends the franchise to be a railroad corporation, and when unexecuted cannot be held to be in itself a vested right surviving the existence of the franchise or an authorized circumscription of its scope. *People* v. *Cook,* 148 U. S. 397; *Pearsall* v. *Great Northern Railway Co.,* 161 U. S. 646; *Bank of Commerce* v. *Tennessee,* 163 U. S. 416, 424.

But it is said that by the filing of the map across township fifteen and the service of its notices, the railroad company so far exerted its capacity to extend and construct as to secure rights in the strip of land which could not be taken at all, or if so, not without compensation.

The railroad law provided that companies formed under it before constructing any part of their road into or through any county named in their articles of association should make a map and profile of the route intended to be adopted, file the same in the office of the clerk of the county in which the road was to be made, and give written notices to all actual occupants of the route so designated, and that any party feeling aggrieved by the location might within fifteen days after receiving notice apply to a justice of the Supreme Court, by petition, who could affirm or alter the proposed route in such manner as might be consistent with the just rights of all parties and the public. The code of civil procedure provided for proceedings to be taken to acquire title to real property for a public use by condemnation.

In this case the railroad company filed its map on September 18 and served its notices September 23, 1897. The forest preserve board on August 6, 1897, had accepted an offer by the owners of lands, over which the route was projected, and conveyance thereof was about to be delivered, when on September 30, 1897, an injunction was granted at the suit of the railway company restraining the owners from conveying. The fifteen days for objections to the proposed route prescribed by the railroad law had not then expired. The State condemned October 7, and on the same day, but subsequently,

-the company commenced proceedings to condemn under the code.

The Court of Appeals held that assuming that the filing of the map created a lien, or something in the nature of a lien, as this was by statute and not by contract, it could be done away with by statute without liability to make compensation, unless some vested right had accrued under it.

The court further held that no lien nor any right in the nature of a lien could be created as against the State by the mere filing of a route map under the railroad law; that the filing established no right against the owners, because that would be in violation of the Constitution; and that it established none against the State because the power of the State was paramount. But the court was of opinion that, as against all other railroad companies, and as against all other creatures of the State empowered to use the right of eminent domain, "it gave the exclusive right to occupy the particular strip of land for railroad purposes until the legislature authorized it to be devoted to some other public use." And the court said: "The claim that a lien, good as against the creator of the corporation, was placed upon the land simply by the grant of a franchise to exist as a corporation in order to build a road, followed by the filing of a map of the proposed route and notice thereof to the occupants, but by nothing else, cannot be sustained. There is no property in a naked railroad route existing on paper only, that the State is obliged to pay for when it needs the land covered by that route for a great public use, and its officers are authorized to act by appropriate legislation."

In arriving at these conclusions the Court of Appeals was construing and applying the laws of the State of New York, and we perceive no adequate ground for declining to accept its views in accordance with the general rule on that subject. In any view, we think that the proceedings on the part of the State impaired the obligation of no contract between it and the railroad company.

Counsel concedes that the sovereign power of eminent domain is inherent in government as such, requiring no constitutional recognition and is as indestructible as the State itself;

and " that all private property, tangible and intangible, is held subject to the exercise of the right by the sovereign power, even that which may already be devoted to a public use."

It is insisted, however, that the constitutional limitations on the exercise of the power, though conditions merely and not part of the power itself, require that the owner shall have an opportunity to contest the legality of the taking, and that ultimate payment of just compensation must be secured.

And the constitutionality of the act of 1897 is attacked as authorizing the deprivation of property without due process of law, and the taking thereof without provision for compensation.

The forest preserve was created by an act of May 15, 1885, and consisted of " all the lands now owned or which may hereafter be acquired by the State of New York within the counties of Essex, Warren, Hamilton and other counties."

Section eight read: " The lands now or hereafter constituting the forest preserve shall be forever kept as wild forest lands. They shall not be sold, nor shall they be leased or taken by any person or corporation, public or private." The forest commission was created by the act, and in 1890 was authorized to " purchase lands so located within such counties as include the forest preserve, as shall be available for the purposes of a state park," and an appropriation was made for that purpose. By an act of May 20, 1892, the Adirondack park was established in the counties of Hamilton, Herkimer, St. Lawrence, Franklin, Essex and Warren, was made part of the forest preserve, and declared to be " forever reserved, maintained and cared for as ground open for the free use of all the people for their health or pleasure, and as forest lands necessary to the preservation of the head waters of the chief rivers of the State, and a future timber supply," and the forest commission was given power to contract for the purchase of land subject to restrictions therein mentioned. Laws on the subject of this park were passed in 1893, 1894 and 1895, and in the latter year a new state constitution came into effect, of which section seven of Article VII was as follows: " The lands of the State now owned or hereafter acquired, constituting the forest preserve, as now fixed by law, shall be forever kept as wild forest lands.

They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed."

Then came the act of 1897, creating the forest preserve board, which was empowered to acquire for the State by purchase or otherwise "such lands, structures or waters" within the limits of Adirondack park as might be deemed advisable for the interests of the State, and to enter thereon and take possession thereof.

By section four it was provided that when the board should have determined to appropriate certain lands, the state engineer should furnish it with an accurate description thereof certified by him to be correct; that a majority of the board should indorse on such description a certificate setting forth that the lands specified had been appropriated by the State for the purpose of making them a part of Adirondack park, which description and certificate should thereupon be filed in the office of the secretary of state; that the board should then serve on the owner of the property so appropriated a notice setting forth the fact of such filing, the date of filing and a general description thereof; and that "from the time of such service the entry upon and appropriation by the State of the real property described in such notice for the uses and purposes above specified shall be deemed complete, and thereupon such property shall be deemed and be the property of the State. Such notice shall be conclusive evidence of an entry and appropriation by the State."

Under the sixth section the owner, if unable to agree with the board on the value of the property appropriated or the amount of damages resulting from such appropriation, might within two years after the service upon him of the notice of appropriation, present to the Court of Claims a claim for the value of the land and for damages, and the Court of Claims shall have jurisdiction to hear and determine such claims and render judgment thereon, provision being made for the payment of such judgment.

By the nineteenth section it was provided that when a judgment for damages was rendered, "and it appears that there is

any lien or incumbrance on the property so appropriated, the amount of such lien shall be stated in the judgment, and the comptroller may deposit the amount awarded to the claimant in any bank in which moneys belonging to the State may be deposited, to the account of such judgment to be paid and distributed to the persons entitled to the same as directed by the judgment."

The lands taken for the park were thereby dedicated to a public use regarded by the State as of such vital importance to the people that they were expressly put by the constitution beyond the reach of any other destination.  The general rule is that the necessity or expediency of appropriating particular property for public use is not a matter of judicial cognizance but one for the determination of the legislative branch of the government, and this must obviously be so where the State takes for its own purposes.  The State possesses the power as a sovereign and as a sovereign exerts it.  How can its citizens call on the courts to review the grounds on which the State has acted in the absence of legislation permitting that to be done?

It is true that the State may delegate the power, and where it has done so to a railroad corporation and by its exercise lands have been subjected to a public use, they cannot be applied to another public use without specific authority, expressed or imperatively implied, to that effect.  But the sovereign power of the State cannot be alienated, and where exercised is exclusive.

In this case the use for the park was in itself inconsistent with the use for railroad purposes, and the legislation and the constitution alike forbade this company to acquire for its use any portion of that which the State had taken for its own exclusive and designated purposes.

Compensation must indeed be made, and inquiry as to its amount in some appropriate way, before some properly constituted tribunal, must be provided for, *Backus* v. *Union Depot Company*, 169 U. S. 557, and it is the rule in New York that where this is done, and a certain, definite and adequate source of payment is provided, compensation need not actually be made in advance of a taking by the State or one of its municipal

subdivisions. *In the Matter of the Mayor, &c.*, 99 N. Y. 569; *Sweet* v. *Rechel*, 159 U. S. 380, 400.

This act fulfils these requirements in that the state treasury is the source of payment, and an appropriate mode is designated for the ascertainment of compensation as to owners and those holding liens and incumbrances. In providing for notice to owners only, the act seems to contemplate that it will appear in the progress of the proceedings to ascertain compensation whether there are outstanding claims, and that such claimants may thereupon come forward and be heard.

We need not discuss the sufficiency of the provision in this respect, since we agree with the Court of Appeals, as has already been indicated, that the railroad company occupies no position entitling it to raise the question. The steps it had taken had not culminated in the acquisition of any property or vested right; and no contract between it and the State was impaired, nor was due process of law denied to it within the meaning of the Constitution of the United States under the circumstances disclosed on this record.

*Judgment affirmed.*