New Bern was founded by de Graffenreid and his followers on the land at the junction of the Trent and Neuse rivers, the Trent River flowing eastwardly and Neuse River flowing southwardly. The first streets laid out were East Front Street along the shore line of the Neuse, and South Front Street along the shore of Trent River. These two streets intersect at right angles at what was then, and has ever since been, commonly known as Union Point.
This place was the residence of the Indian King, Taylor, from whom de Graffenreid bought it, and erected thereon the first government house. In the angle of the two streets, extended, on the south and east, and between said streets and the channels of said rivers, lay some ten acres, more or less, of land covered by the waters of the two rivers. From the beginning, this land was regarded as community property by the Indians, by the first settlers under the proprietary government, during the colonial period, and when the State government was organized. The General Assembly, in 1779, vested the property in the commissioners of the town and their successors forever, "to and for the use of said town, and that the said commissioners, or their successors, forever, shall and may take and receive the rents, issues and profits of the same, for the use of the said town, and to and for no other use, intent or purpose whatsoever." As stated by Maj. J. R. D. Matheson, corps of United States engineers, in his report to the War Department, 31 January, 1921, "It is an ideal site for a public wharf with rail connection." By an agreement of doubtful validity, 7 February, 1885, for the sum of $1 per year, Moore Brady attempted to lease the property for the term of ninety-nine years, with the privilege of an additional term of ninety-nine years, and establishing there an oyster-canning plant. They filled in several acres with oyster shells, and then quit business and conveyed their right to the property to E. H. J. A. Meadows Company, which erected a wall around the property to protect it from the wash of the *Page 138 
rivers, and built houses thereon and occupied and used the same. More than ten years ago the board of aldermen of the city required R. A. Nunn, city attorney, to investigate the validity of the lease, and he reported, 6 August, 1913, that in his opinion the lease was voidable, because made contrary to law.
From that time until 13 January, 1923, negotiations for cancellation of the lease and surrender of the property to the city were pending. The occupants of the property claimed that the property was worth over $100,000 and that the improvements made thereon had cost them about $75,000. Disinterested citizens, considering all of the circumstances, acting at the request of all concerned, estimated that the city should pay the occupants as much as $37,000, but the city finally acquired whatever interest the holder of the lease had for the sum of $22,500.
Notwithstanding the well-known history of the property, the plaintiffs now contend that it was reacquired by the city without public necessity, at an exorbitant price, for the benefit of one or more individuals, and as a device illegally to take the plaintiffs' property from them.
The city contends that, in fact, the property has always belonged to the community, and that for many years there has been an urgent demand upon the part of the citizens generally that it be devoted to public uses, for the benefit of the great number of industrial and manufacturing and shipping interests. As set out in the eighteenth allegation of the answer, and by resolution of the board of aldermen of said city, it was duly determined that it is to the best interest of the city and, indeed, necessary for the city to acquire lands by purchase or condemnation proceedings for the public uses and purposes of extending a railroad from the main track of the Atlantic and North Carolina Railroad Company to Union Point. This railroad was built principally by the State and certain counties, and is still owned by them, Craven County owning 1,293 shares of its capital stock. Its physical connection with the waterways and wharves at New Bern will not only benefit all of the people in Craven County, but all of the people in the State living in the territory wherein freight rates are based upon rail and water competition at New Bern.
The physical connection and combined use of the rail and water transportation facilities was the very idea and hope of Murphey, Graham, Morehead, and other men who promoted internal improvements before the Civil war. The track of the Atlantic and North Carolina Railroad crosses Trent River at New Bern at an angle, and plaintiffs' narrow strip of land adjoining is so situated that by extending their line to the channel of Trent River the railroad company may be deprived altogether of reasonable or adequate docking facilities, and the railroad *Page 139 
company never has had anything more than a very narrow and inadequate dock and wharf until this track was constructed parallel with Trent and Neuse rivers and connecting with the Union Point property, which is to be developed as a municipal wharf, as Wilmington, Norfolk, Baltimore, New York, and many other cities and towns on the water have developed municipal wharves as public necessities.
The entire work of laying tracks, building trestles and platforms has been fully completed, and the actual operation of trains over the right of way is an established fact, existing for about thirty days prior to the hearing of this appeal, and the defendants asked that the same should be dismissed.
A temporary restraining order had been granted on 5 February, 1923, upon the complaint of the plaintiffs, which was used as an affidavit to restrain the defendants, its officers and agents from entering upon any part of the lands described in the complaint for the purpose of laying out a railroad sidetrack or for any other purpose, but upon affidavits and after a full hearing, on 16 February the restraining order was dissolved by the judge, and the action was dismissed. Appeal by plaintiffs.
The record discloses that the land sought to be condemned for the purposes of railroad facilities is a portion of land lying wholly within the business district of the city and devoted entirely to the wholesale business of the city, large industrial enterprises, coal yards, bottling plants, fish houses, wharves, docks and warehouses of citizens, running through the mill yards, ship yards, cotton exchange, and the valuable property of the city, known as Union Point, at the confluence of the Neuse and Trent rivers, whereon wharves and warehouses are to be erected on deep water for the loading and unloading of ships and vessels in connection with the operation of the railroad cars over the tracks laid through the district on the right of way acquired and condemned for that purpose, from which condemnation out of all of the owners whose lands have been taken for the purpose these plaintiffs only appeal, and they alone charge for the right of way.
The plaintiffs contend that this track is a private enterprise and not for the public use, and base this claim upon the ground that a railroad is sometimes termed a private carrier, but it is apparent that the construction of this track along the rivers through the business, shipping and manufacturing area of the city is one of the most valuable and *Page 140 
beneficial undertakings that has ever been entered upon in the city, and one from which the entire public do and will receive more actual benefit than any other public enterprise ever entered upon by the city government or the citizens of the community for the benefit of the public.
From the above it will be seen the great benefit which the defendants expect to be derived by the whole community, and not only by the whole community, but by all persons in the State interested in the freight rates at New Bern from the operation of trains from the main line of the Atlantic and North Carolina Railroad, and other roads entering the city to deep-water terminus on Neuse and Trent rivers.
The railroad track, the laying of which the plaintiffs seek to enjoin in this proceeding, has been entirely laid and the work completed, and trains have been for some time operating over the track in carrying and receiving freight to and from the numerous warehouses and wharves and places of business along the right of way.
This is not like the case where a tree has been cut down, or other irreparable act has been committed, and, therefore, we need not consider the suggestion made by the city that the completion of this work is irreparable and could not be cured if there had been error committed; for in this case, if there had been error, the tracks, though laid down, could be torn up and the status quo ante restored. The court would not be deciding an abstract question.
We do not think, however, there has been any error committed. C. S., 2791, provides that when, in the opinion of the governing body of any city desiring to have and exercise the management and control of wharves or other public utilities which are or may by law be owned and operated or hereafter acquired by such city or by a separate association, corporation or other organization on behalf, and for the benefit, of such city, any land, right of way, water right, privilege, or easement, either within or outside the city, shall be necessary for the purpose of opening, establishing, building, widening, extending, enlarging, maintaining, or operating any such wharves, etc., or other public utility so owned, operated and maintained by or on behalf of any such city, such governing body may purchase such land, right of way, water right, privilege, or easement from the owner or owners thereof, and pay such compensation as may be agreed upon. And C. S., 2792, provides that, if such governing body is unable to agree with the owners for the purchase of such land, etc., condemnation of the same for such public use may be made in the same manner and under the same procedure as is provided in chapter Eminent Domain, Art. II; and the determination of the governing body, board, commission, ordepartment of government of such city of the land necessary for suchpurposes shall be conclusive. *Page 141 
Section 53, Private Laws 1899 — i. e., the charter of the city of New Bern — provides for the manner in which the board of aldermen shall straighten, widen or establish new streets when in their opinion the same shall be necessary.
The General Assembly of North Carolina, by an act ratified 19 December, 1921, chapter 128, Private Laws, Extra Session 1921, entitled "An Act to authorize the board of aldermen of the city of New Bern to open and, if necessary, to condemn land in said city for the use of a railroad side-track," authorized the board of aldermen of the city of New Bern to "lay off, establish and open, in, over, through and across the territory in said city bounded by Hancock Street, South Front Street, Neuse River and Trent River, for the use of a railroad side-track and convenience of industries already established or to be established in said territory, a right of way, not less than 20 feet in width, and extending from the main track of the Atlantic and North Carolina Railroad Company in Hancock Street to Union Point on Neuse River, in the same manner as said board is authorized by section 53 of chapter 82 of the Private Laws of 1899 to lay off and establish new streets, and all the provisions of said section shall apply if condemnation be necessary to acquire such right of way."
The plaintiffs contend that this act is void and unconstitutional, because they say that it is a private act, and thirty days notice was not given before its passage. This contention was made before the General Assembly, it appears, from the time the bill was introduced until the close of the session, but the two committees, after fully hearing, decided that there was no constitutional prohibition; that the bill was not a private one, and that public necessity required its passage over the objections of the plaintiff and the gentlemen employed to prevent its passage.
The plaintiffs counsel, in his brief, says: "This is undoubtedly a private law. It is printed in the private laws." Whether a statute is private or public depends upon its purport and not upon the judgment of the person who directs the compilation in which it shall be published. InHancock v. R. R., 124 N.C. 222, where the Fellow-Servant Act had been printed as chapter 56, Private Laws 1897, the Court held it to be a public act, notwithstanding, and said: "The mere fact that the statute appears in, and as a section of, a private one, does not make it private. It is well settled that one part of a statute may be private, while another part may be public and general, or local. It not infrequently happens that public statutes contain provisions of a private nature, and vice versa." Ruffin,C. J., in Humphries v. Baxter, 28 N.C. 437. The same ruling has been made in S. v. Wallace, 94 N.C. 828; Hancock v. R. R., 124 N.C. 225; S. v.Patterson, 134 N.C. 615. *Page 142 
An act of the Legislature is presumed to be valid, and all doubts are resolved in its support, and it will not be held unconstitutional unless the conflict between the fundamental law and the legislation is manifest and without reasonable doubt.
The condemnation in this case is for a public purpose, and it was within the power of the eminent domain under the provision of the statute above cited to take such property for public use in the manner stated. The operation of this side-track along the river fronts of the city of New Bern must be of great benefit to all shippers, manufacturers, merchants, and industries along the right of way. It is essential that the municipal docks and wharves shall be physically connected with the railroads of the country, and this track is the only means by which this can be done in the city of New Bern.
The local office of the United States engineer completed the compilation of statistics for the commerce carried on Neuse River for the year 1922, the same being published in the public press of the State. This compilation shows a total of 277,139 tons, valued at $6,382,364 in the 1922 record, as against a record of less than half that tonnage for 1921, and not more than two-thirds of that value in the preceding year.
The lack of terminal facilities has doubtless prevented the public from enjoying the low freight rates prevailing where water transportation is obtained. To procure better freight rates has moved the people of that community to establish municipal wharves, but the wharves cannot be successfully maintained without railroad connection.
In Bragg v. Weaver, 251 U.S. 57, the Court held: "Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the State may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment. Mississippi River Boom Co. v. Patterson,98 U.S. 403; Backus v. Union Depot Co., 169 U.S. 557; R. R. v. N. Y.,176 U.S. 349; Sears v. Akron, 246 U.S. 251. Numerous cases have held that "the necessity and expediency of taking property for public use is a legislative and not a judicial question, and is not open to discussion." Neither is it any longer open to question that "the Legislature may confer upon a municipality the authority to determine such necessity for itself. The question is purely political, does not require a hearing, and is not the subject of judicial inquiry."
The plaintiffs rely upon Stratford v. Greensboro, 124 N.C. 127, but as to that case it was said by Hoke, J., in Edwards v. Comrs., 170 N.C. 451, cited in Allen v. Reidsville, 178 N.C. 532: "In that case there was specific allegation, with evidence tending to show that the action of the city authorities was in pursuance to a contract admittedly *Page 143 
entered into with the individual defendant and making it according to plaintiff's evidence, not at all improbable that the measure complained of was in promotion of a personal and private scheme in favor of the individual defendant, and not in furtherance of the public interest."
In Lee v. Waynesville, 184 N.C. 568, Hoke, J., speaking for a unanimous Court, and citing numerous cases expressly in point, says: "It is the accepted principle, declared and upheld in numerous decisions with us, that courts may not interfere in a given case with the exercise of discretionary powers conferred on local administrative boards for the public welfare, unless their action is so grossly unreasonable as to amount to an oppressive and manifest use of their discretion."
The act of the Legislature under which the city was empowered to act, and did act, in the condemnation of this right of way, was clearly within the power of the General Assembly, and there is nothing which indicates any defect, either in the motive or in the manner of the execution of the power conferred.
We cannot see that any injustice has been done to the plaintiffs in taking an easement for public purposes over a strip of land 20 feet in width and 129 feet long, the said lot being 713 feet deep. It appears that there is nothing put on the right of way taken except the rails of the railroad resting on cross-ties buried in the ground, and there is no obstruction whatever, except when trains are passing. No structure of any kind has been disturbed. Railroad facilities have been supplied to portions of plaintiffs' property which did not have such facilities before. No calculable damage has been done to plaintiffs, and to all appearances there has been liberality in the assessment of damages. The claim of plaintiffs for $50,000 damages for an easement over 20 feet of land across the back end of a lot 129 feet long seems unreasonable. The plaintiffs charge that the city paid an exorbitant price in giving $22,500 for the release of several acres of land, for a lease extending 160 years to come, which land was more advantageously located and which is at the junction of two streets and bounded by the channels of two rivers, with the improvements thereon.
Upon the most careful survey and consideration of the claims made by the plaintiffs, we do not see that the right of eminent domain has been injuriously exercised to the detriment of the plaintiffs. It seems, upon the evidence, to have been called for by the geographical situation of the property in question and by the public and commercial needs of the city of New Bern and its citizens. All who had rights involved by the proposed extension of the railway to this point at the union of the two rivers have willingly, in the public interest, conceded the right of way without compensation, except these plaintiffs. They had a right to call for compensation, and that is a matter properly adjusted in *Page 144 
condemnation proceedings, but there is no appearance or indication of any unconstitutionality in the act, or of oppression on the part of the city.
The enterprise thus undertaken was justified, and seems to have been imperatively demanded, by public necessity.
The judgment dissolving the injunction is
Affirmed.