## UNITED STATES v. CERTAIN PARCELS OF LAND IN TOWN OF DENTON OF CAROLINE COUNTY, MD., et al.

### No. 76.

District Court, D. Maryland.

Dec. 4, 1939.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., for plaintiff.

Willis R. Jones, of Baltimore, Md., for intervenors.

Wm. J. Rickards, of Denton, Md., for commissioners.

CHESNUT, District Judge.

In this case the United States is proceeding to condemn for the purpose of erecting a post office, a certain lot of ground in Denton, the County Seat of Caroline County, in the State of Maryland. The property so sought to be condemned includes a part of a public square or park surrounding the

County Court House for Caroline County, the title to which is vested in the County Commissioners of Caroline County. They have been made parties to the case but interpose no objection to the condemnation. However, certain owners of property on public streets in Denton facing the Court House Square have filed leave to intervene and oppose the condemnation on the ground that the property sought to be condemned is already devoted to public use, and therefore may not be condemned in the absence of a specific Act of Congress providing therefor. And in support of that proposition it is contended that the Congressional legislation under which the condemnation proceeding has been brought is general and not specific.

The Federal Constitution, Article I, § 8, cl. 7, U.S.C.A., gives to Congress the power "to establish Post Offices and post Roads;" and clause 17 gives the power to exercise exclusive legislation "over all Places purchased by the Consent of the Legislature of the State, in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;" and the Legislature of Maryland (Code, Art. 96, § 31) has given the consent of the State, "in accordance with the seventeenth clause, eighth section of the first article of the constitution of the United States, to the acquisition by the United States by purchase, condemnation or otherwise of any land in this State required for sites for custom houses, courthouses, postoffices, arsenals or other public buildings whatever, or for any other purposes of the government." By the Act of Congress of May 25, 1926, ch. 380, § 1, 44 Stat. 630, 40 U.S.C.A. § 341, Congress authorized and directed the Secretary of the Treasury to acquire by purchase, condemnation or otherwise such sites as he may deem necessary for post offices (and other federal buildings) in the states, territories and possessions of the United States. Acting under this statute the Secretary of the Treasury has determined to acquire the land in question by condemnation; and the proceeding therefor has been brought in this court under the Federal Condemnation Statute regulating procedure which, in this case, is similar to that prevailing in the Maryland Courts. 40 U.S.C.A. §§ 257, 258. It is not contended by the petitioners that the constitutional and statutory provisions are insufficient to authorize the condemnation in this case of any *private property* that the Secretary may have selected for

the post office, but only that the legislation is not sufficiently specific to warrant the taking of public property of the County, which is a governmental unit of the State of Maryland.

By the Maryland Act of 1790, ch. 11, the County Seat of Caroline County was transferred from Melville's Warehouse to Pig Point (now Denton) and certain named individuals appointed to be commissioners for Caroline County were authorized to acquire or condemn four acres of land at the latter place for purposes of a court house and jail, and to erect said buildings thereon. Acting thereunder the Commissioners caused the land to be condemned in accordance with the procedure then prevailing, and the land was valued at that time (June 21, 1791) at "30 shillings 1 current money per acre"; and in due course a record of the condemnation proceeding was recorded in the Land Records of Caroline County in Liber W. R. No. C, folio 430, etc. With the exceptions hereinafter mentioned the four acres of ground have since been held by the County Commissioners of Caroline County and devoted to public purposes in the maintenance of a court house and jail. Some years ago the jail was removed to another location. It is also agreed that the County Commissioners have no legal authority to sell or convey the property to the United States or to expressly consent to its condemnation, without an enabling act of the Maryland Legislature. These four acres of land (rectangular in form) around which the town of Denton has been built, have ever since their acquisition been used for the public purposes stated, and are bounded on the north by Gay Street, on the east by Second Street, on the south by Market Street and on the west by First Street. The distance from Market Street to Gay Street is about 250 feet; and the length of the lot fronting on Market Street is about 436 feet. The County Court House is situated approximately in the middle of the whole lot, and it is an attractive town center or park with many large trees thereon. The only buildings on the whole area besides the Court House consist of a building known as the Masonic Lodge, situated at the southeast corner of the lot fronting about 40 feet on Market Street with a depth of about 65 feet on Second Street; and adjacent thereto on Market Street is a small office building used by the County Health Department. The Masonic building, a three-story frame structure, was erected under authority of an Act

of the Maryland Legislature, ch. 269, laws of 1884. Thereby the County Commissioners of Caroline County were authorized to transfer and grant to certain named trustees and their successors that portion of the whole four acre tract "bounded by Market, Second and Gay Streets and a line drawn with the county fence on the east side of the Court House enclosure from Gay to Market Streets; in trust" to erect thereon a building with a front not exceeding 40 feet and a depth not exceeding 80 feet, with a room suitable for a Town Hall, and lodge and other rooms, and to appropriately furnish the same; to pay the cost thereof from private subscriptions, and to collect the rents and profits therefrom and distribute and pay the same to the subscribers, with authority to borrow money on the property and to mortgage the same therefor; "provided, that the public ground not occupied by said building shall be used only for public purposes". It was further provided in the Act that the trustees in managing the property should be subject to the control and wishes of the subscribers who were given power to fill vacancies in the board of trustees, or remove them and substitute others.

The portion of the whole lot proposed to be condemned by the government is the most easterly portion thereof fronting about 100 feet on Market Street running westerly from Second Street, with a depth of approximately equal width running northerly to Gay Street, thus forming a rectangular lot approximately 100 feet by 250 feet, bounded on the east by Second Street, on the North by Gay Street and on the south by Market Street. The westerly line of this lot is situated about thirty feet easterly from the east wall of the Court House, the court room being on the second floor and having windows on the east and west sides. The lot proposed to be taken includes the whole of the lot held by trustees for the Masonic Lodge, and there is also thereon a small one-story building on Market Street used by the County Health Department.

All persons or corporations who are known to have any title, ownership or interest in the lot sought to be condemned were specifically named as defendants in the government's petition for condemnation. None of them have interposed any objection to the condemnation. It appears from the answers filed by some of the named defendants that the parties interested in the Masonic Lodge property, including the building thereon, had agreed to sell their rights and interest to the government prior to this proceeding for $12,000; and the County Commissioners in whom the title to the whole of the lot to be condemned is vested, with the exception of the rights created by the special legislation above referred to with regard to the Masonic Lodge and the appurtenant lot, also, prior to this proceeding, passed a resolution agreeing to donate to the government the desired land as the Commissioners believed that it would be greatly to the advantage of Caroline County and the residents of the town of Denton to have the post office erected on the property. But when this action of the County Commissioners became known certain citizens of Caroline County instituted an injunction proceeding against the County Commissioners in the Circuit Court for Caroline County to restrain them from deeding the property to the government; and that suit has been suspended pending the outcome of the present condemnation proceeding. The State of Maryland has filed its answer disclaiming any interest in the land to be condemned other than for a possible tax claim.

 The original petition of condemnation was filed in this court on January 7, 1939, and an amended petition specifically naming certain other defendants was filed June 19, 1939. On January 26, 1939, Ernest G. Cooper and six other residents and taxpayers of Caroline County who owned and resided in property situated on the opposite side of the street from the property sought to be condemned filed their petition to intervene. They claimed an interest in the property sought to be condemned by reason of the alleged probable consequential impairment of the value of their property by the erection of the post office and additional use of the street incidental thereto. The result of the hearing on this petition was the determination that the petitioners did not have a direct interest in the land to be condemned sufficient to allow them to intervene as parties to the case on that ground, but, as it appeared that none of the other defendants in the case intended to present any objection to the authority of the United States to condemn the property, the petitioners were allowed to intervene for the purpose of presenting this defence. It seems reasonably clear that they do not have a property interest sufficient to warrant their being made defendants in the case for any other purpose. Radford Iron Co. v. Appalachian

376

Elec. Power Co., 4 Cir., 62 F.2d 940; New York v. New York Telephone Co., 261 U.S. 312, 43 S.Ct. 372, 67 L.Ed. 673; C. M. Patten & Co. v. United States, 9 Cir., 61 F.2d 970; Bedford v. United States, 192 U.S. 217, 224, 24 S.Ct. 238, 48 L.Ed. 414; Northern Transportation Co. v. Chicago, 99 U.S. 635, 642, 25 L.Ed. 336; Krebs v. State Roads Comm., 160 Md. 584, 154 A. 131; Beale v. Takoma Park, 130 Md. 297, 100 A. 379.

■ These intervenors have now moved to dismiss the condemnation proceeding on the ground that the government is without power to condemn the land now devoted to another public use, in the absence of specific Act of Congress relating to the particular property. At the hearing on this question of law testimony was also submitted with respect to the present public use of the property, and the grounds of objection by other residents of Denton and citizens of Caroline County to the proposed condemnation. The objections fall into three classes: (1) those of the owners of residential property situated on Second and Gay Streets immediately opposite the land proposed to be taken; (2) objections to any impairment of the integrity and continued maintenance of the whole of the Court House Green for any purpose other than the maintenance of the County Court House thereon; and (3) objections expressed in writing by the Chief Judge and three Associate Judges of the Second Judicial Circuit of the State of Maryland, which includes Caroline County, on the ground that the proposed taking of the land and the erection and use of the building for post office purposes would be likely to obstruct and impair the convenience and efficiency of the administration of justice in the County Court House. The latter objections are based on anticipated noise resulting from the operation of automobiles or trucks delivering or receiving mail for distribution; and curtailment of the natural light and air now enjoyed by the large open spaces on both sides of the Court House; and diminution in area of the surrounding Court House Green or yard which is said to be habitually used by litigants, witnesses, counsel and others in connection with the court's activities; possible impairment of facilities for future enlargement of the Court House; and also to the extent that it is legally considerable, impairment of the Court House Square. This latter objection is feelingly and eloquently expressed by the Judges as follows:

"The charm and beauty of these old places (our Court House Greens, as they are called here), which go back over the past for a period of 150 years, appealed to the deepest sentiments of our fathers as they do to us. Here have gathered men from the earliest days of our republic down to this day to consider and discuss public questions of deepest interest, and to fervently advocate and proclaim by those eloquent in speech these principles of our free government that have made us great. Here above all other places have the youth assembled, even to this day, to hear and discuss freely the questions and problems that are of such vital concern to all of us. Under the spreading branches of age-old trees elderly men gather in the evening to spend an hour in homely discussions, and much of the life of our communities centers about these historic places. It is such scenes and memories that endear them to all of us. To lay the axe to the root of these old trees, to cover large spaces of green grass with concrete and brick, to our minds is unthinkable."

I have given very careful consideration to these views of the State Judges (which were submitted indeed pursuant to a suggestion of this court and are entitled to great weight). In addition I may properly take judicial notice of the facts because under an Act of Congress this court is authorized to hold sessions from time to time in Denton on the condition that accommodations for the court are provided free of expense to the United States, and the Judges of this court have from time to time held such sessions in Denton only by the courtesy of the State Judges in affording the use of the County Court room. However, I am persuaded by the testimony in this case that the anticipated inconvenience or impairment of facilities for the County Court will not in fact be occasioned by the new post office building. At the last hearing the plans for it, and the landscaping treatment of the lot to be condemned so far as it was possible to progress them at this time, were submitted in evidence. These plans call for a *one-story* post office building of a comparatively small area facing Market Street on the south and setting back therefrom on a line with the present County Court House, and with surrounding attractively landscaped area with grass plots and necessary cement walks. The erection of the new structure will necessarily require the removal of the present Masonic Lodge building which is admittedly at present an architectural feature marring the integrity of the Court House Square, and the removal of which, for æsthetic reasons seems to be desired by

all parties in interest. The plans for the new post office building provide for a location which will make the intervening space between the County Court House and the west wall of the post office approximately 50 feet. As the new building is to be only one story in height and the County Court room is on the second floor of the Court House there would seem to be no possibility of interference with light and air necessary and convenient for the latter. And the testimony also shows that there is no probability of interference with the court sessions by noise arising from the post office or its incidental activities. Nor will the erection of the new post office necessitate the removal of more than a very few of the many stately and ornamental trees now standing on the lot to be condemned. It is true that the acquisition of the lot by the government will remove it from the jurisdiction of the County Court and it is legally possible of course that the government upon acquiring the land may at some remote time in the future make use of it for additional buildings and structures, but nothing of that kind is now contemplated or, so far as can be foreseen, is likely to eventuate. The proposed new building is apparently adapted only for post office purposes; and there is no present plan or appropriation, so far as I am advised, for its enlargement sufficient, for instance, to include facilities for this court therein or in any adjacent building. I am also by no means unmindful of the very laudable desire of the State Judges and certain residents of Denton and citizens of Caroline County to preserve the integrity of the Court House Green. It is indeed a very attractive feature in the town of Denton and is probably the largest Court House Square or Green in any of the Maryland towns. From the aesthetic and historical points of view it is no doubt eminently desirable that its integrity be preserved. On the other hand from the practical standpoint of present conditions, it seems quite clear that the removal of the present frame structure referred to and the erection of a new post office with the incidental landscaping of the remainder of the lot, will improve rather than impair the natural beauty and attractiveness of the whole Court House Green as it now exists. Nor is it to be overlooked that the project is thought a very desirable improvement not only by the County Commissioners who are the official representatives of Caroline County, but also by many individual residents of Denton.

Probably much of the local objection to the project will be removed when the plans for the new post office building become generally known. The new building will occupy in area but a small part of the whole lot to be acquired, and the remainder will continue to be public property, and will doubtless be open to the public as heretofore, with only a change of legal jurisdiction thereover from the County to the federal government, of which the citizens of Caroline County are also citizens. There should be no reason to think that its management hereafter by the government will be other than for the best interests of the locality.

These considerations are perhaps relevant to the subject matter to the extent that they have a bearing upon the importance of the public use to which the property is now put. But whatever may be the merits of the two points of view as to the desirability of the new post office building in this location, the controlling question of law to be decided is simply whether the government has the *power*, under the legislation referred to, to condemn the property. If it has, then the relative desirability or undesirability of the project cannot importantly influence the result. The suggested lack of power is that Congress has not specifically authorized the taking of the particular property. That the government has the power to condemn property within the States for proper federal purposes, was apparently first decided in the case of Kohl v. United States, 91 U.S. 367, 23 L.Ed. 449, and has since been consistently maintained. But it is said that because this particular property is now devoted to a prior public use, general legislation authorizing the construction of post offices, together with a particular appropriation for this post office, and the authority delegated by Congress to the Secretary of the Treasury to make selection of sites, is not sufficient in the absence of a specific Act of Congress authorizing the taking of the particular property. On examination of the authorities I find that the contention is not a new one. It was very fully considered and rejected by District Judge Killits in the case of United States v. City of Tiffin, C.C., 190 F. 279, which has frequently been subsequently cited with approval in many cases, including that of United States v. Southern Power Co., 4 Cir., 31 F.2d 852, 856. In the Tiffin case an Act of Congress had authorized the construction of a federal building in the

City of Cincinnati and the site selected by the Secretary of the Treasury included in part a city alleyway. The contention was stated as follows [190 F. 280]:

"land in public use cannot be taken for another and inconsistent public use under general legislative power of condemnation, but the right must appear, to seize this particular property, by express provision directed toward the special property, in some pertinent legislation or be the inevitable implication arising from such special legislation. This rule is established and the numerous authorities which support it are collated in a note on page 614 of 15 Cyc."

Answering it, the court said:

"The attempt to apply the rule, however, in this case ignores the difference in status between the United States and its relation to lands sought to be devoted to public use and the parties attempting to condemn in the cases giving rise to the rule.

"The United States has paramount authority in the matter of taking any property within its borders for those public uses which are within the constitutional reservations to the general government. * * * The principle of strict construction of either the nature or extent of this right applies to neither sovereignty for the reason that such right is a very part of the sovereignty itself, existing from the beginning. This does not mean, however, that no power may intervene to prevent arbitrary action, for such power certainly abides with the courts. * * *

"An examination of the cases which support the rule in question shows that in each in which the right to condemn was denied the attempting condemnor was a municipal or a private public service corporation, which was vanquished by the application in this particular sense of the general principle that the legislative grant to it of a right to condemn must be strictly construed. No authority is shown, either in the briefs or in our own researches, in which the rule is applied against the sovereignty which it was established to protect. * * *

"Assuming the rule is applicable, then the government, after Congress had passed the necessary general legislation to establish a post office in this particular city, and the Secretary of the Treasury had exercised the semi-judicial function cast upon him by law to determine the necessity of any particular plot of ground and had selected this strip of alley, the maintenance of which is of very slight consequence to the city of Tiffin at large, would be compelled to await a session of Congress and reopen the whole matter for the purpose of getting an act passed specially designating this alley as one of the component parts of the site. It seems to us the statement of that proposition is all that is necessary to prove that the sovereign power ought not to be so hampered, and that the rule, having its birth in a jealousy for the rights of sovereignty, should not be extended to embarrass the object of its service."

The general legislation applicable to this case was also held sufficient to justify the taking of public property devoted to a prior public use, in C. M. Patten & Co. v. United States, 9 Cir., 61 F.2d 970 (a case very like the present on the facts, reversed by the Supreme Court because the case had become moot, 289 U.S. 705, 53 S.Ct. 687, 77 L.Ed. 1462) where a part of the public plaza in Los Angeles was condemned for a post office site. See also United States v. 40 Acres of Land, D.C., 24 F.Supp. 390; and United States v. 60 Acres, D.C., 28 F. Supp. 368. That the government under appropriate legislation may take land devoted to a prior public use, upon making just compensation, was expressly ruled in United States v. Gettysburg Elec. Ry. Co., 160 U.S. 668, 16 S.Ct. 427, 40 L.Ed. 576.

■ The rule invoked by the intervenors in this case, that property devoted to a prior public use cannot be taken for another public use, except by virtue of specific legislation which authorizes it to be done in express words or by necessary implication arising from the subject matter, is really only a rule of construction of the terms of the grant of the power sought to be exercised; and we find that the rule has been applied principally, if not solely, in interpreting the scope of the power to condemn given by a State to one of its corporate creatures. Where a corporation given the power to condemn property for its uses seeks to condemn property of another public service corporation, the question of construction of the grant of power to the former arises, to determine whether the Legislature has expressly or by necessary implication included the power to condemn the property of the latter corporation, already devoted to a public use. The rule is well illustrated by Western Union Tel. Co. v. Pennsylvania R. Co., 195 U.S. 594, 25 S.Ct. 150, 49 L.Ed. 332, 1 Ann.Cas. 533, where the Western Union desired to

condemn a right of way along the tracks of the Pennsylvania Railroad Company. Again, in Adirondack R. v. New York State, 176 U.S. 335, 20 S.Ct. 460, 44 L.Ed. 492, where the conflict was between the right of way of a railroad projected but not built, and a subsequent State Act authorizing the condemnation of the land for a public park, the court said, 176 U.S. at page 349, 20 S.Ct. at page 465, 44 L.Ed. 492:

"It is true that the state may delegate the power, and where it has done so to a railroad corporation, and by its exercise lands have been subjected to public use, they cannot be applied to another public use without specific authority, expressed or imperatively implied, to that effect. But the sovereign power of the state cannot be alienated, and where exercised is exclusive."

Likewise in Maryland, the rule has been clearly discussed and applied by the Court of Appeals, speaking by Judge Urner, in Northern Central R. Co. v. Mayor & City Council of Baltimore, 133 Md. 658, 106 A. 159. See also 20 C.J. 602; Nichols on Eminent Domain, 2d Ed., Vol. 2, § 361; Lewis on Eminent Domain, 3d. Ed., Vol. 2, § 440.

▮▮ In my opinion the rule relied on by the intervenors is not applicable to this case. We are not here dealing with a question of interpretation of the powers of two separate corporations under the laws of a particular State, but with the sovereign and paramount authority of the federal government to acquire property necessary or suitable for a post office, which is clearly within the express grant of power given by the Federal Constitution. There is no question of interpretation of a statute necessary because Congress has very clearly delegated to the Secretary of the Treasury the power to select the sites for post offices within the several States. The only open question therefore is whether in exercising this power the Secretary has acted arbitrarily or capriciously. If he has done so, there is ample judicial authority to the effect that the courts may intervene to restrain the exercise of the power. In C. M. Patten & Co. v. United States, supra, it was said [61 F.2d 972]:

"However, this right of the federal government to condemn is subject to the power of the courts to intervene and prevent arbitrary and unnecessary action, which must be determined by the facts in each particular case."

See also United States v. City of Tiffin, C.C., 190 F. 279, 280; United States v. 4,450.72 Acres of Land, D.C., 27 F.Supp. 167; United States v. Certain Land in Town of New Castle, C.C., 165 F. 783; Stockton v. Baltimore & New York R. Co., C.C., 32 F. 9; State of Missouri ex rel. and to use of Camden County, Mo. v. Union E. L. & P. Co., D.C., 42 F.2d 692. On the other hand if it is not affirmatively shown that the Secretary has acted arbitrarily in selecting this site, then his decision is conclusive and not subject to judicial review. Chappell v. United States, 160 U.S. 499, 510, 16 S.Ct. 397, 40 L.Ed. 510; Potomac El. P. Co. v. United States, 66 App.D.C. 77, 85 F.2d 243, 246, certiorari denied 299 U.S. 565, 57 S.Ct. 27, 81 L.Ed. 416; Bragg v. Weaver, 251 U.S. 57, 58, 40 S.Ct. 62, 64 L.Ed. 135; Fish v. Morgenthau, D.C., 10 F.Supp. 613, 616.

▮▮ In this case the testimony does not show any arbitrary action of the Secretary in the selection of the particular site for the post office. On the contrary the selection seems to have been made after a careful consideration and weighing of the relative advantages and disadvantages of various possible locations in Denton for the post office. Furthermore the County Commissioners who are the holders of title to the particular property, and official representatives of the County, specially favored the particular site to the extent of formally expressing their willingness to convey it to the government free of charge. There is also evidence that the particular site is the best available location for the post office considering the service that it is to render to the local community. It is true that there were other available sites which could have been selected, probably with little greater inconvenience to those who use the post office, but there is nothing to suggest that the site selected was chosen arbitrarily or without careful consideration of other available locations; and as a matter of fact there was much local sentiment in favor of the site chosen, although public opinion in Denton seems to be sharply divided on the issue. If the evidence required a finding that the site selected would materially affect judicial administration in Caroline County, quite a different case would be presented.

Counsel for the intervenors rely strongly on the case of United States v. Southern

Power Co., 4 Cir., 31 F.2d 852, 856, where Judge Parker, speaking for the Court, after referring to the rule relied on by the intervenors, says:

"It is true that this rule is ordinarily applied in grants of power to public service corporations, and not where the power is being exercised by the state itself for its immediate purposes. U. S. v. City of Tiffin (C.C.) 190 F. 279. But it is based, not upon any lack of power upon the part of the government, but upon the presumed intention of the Legislature, and should be held to apply in condemnation proceedings, even by the state itself, *where the prior public use could not reasonably interfere with the purpose for which condemnation is authorized.*"

I have italicized the concluding phrase because from the context it will be noted that it constitutes a significant limitation upon the prior part of the sentence, as a careful examination of the whole case will clearly show. The court was not there dealing with a case where the power of condemnation was directly resisted, but was rather concerned with what effect a prior condemnation, under congressional power to acquire lands for forestry purposes, had upon an existing right of way for power lines therethrough. Under the particular facts, arising out of prior negotiations between the contending parties, it was held among other things that it would not be equitable to find that the condemnation had destroyed the right of way for the power line. We are dealing here with an entirely different situation. It would certainly interfere with the ordinary activities of the post office department if the many sites for post offices chosen by the Secretary, which doubtless often, as in the case of the City of Tiffin, supra, require the acquisition of some publicly held property, could not be acquired by the government by condemnation when necessary except after the delay incident to obtaining a special and specific Act of Congress for the taking of the particular public property. To avoid any such delay Congress has given the Secretary power to select the sites, and there is no need for construction of the language used. Even if there were such need the nature of the subject matter necessarily implies that the Secretary may select sites already in public use, if he does not act arbitrarily or without reasonable regard for the state or municipal interests involved.

Therefore I feel obliged to conclude that the government does have the power to condemn the lot here in controversy. And the motion of the intervenors to dismiss the case is accordingly hereby overruled, with exception, if any necessary, noted.