THE COMMONWEALTH OF PUERTO RICO, Plaintiff and Appellant, v. JORGE I. ROSSO ET UX., Defendants and Appellees.

No. AP-65-48.     Decided December 7, 1967.

*J. B. Fernández Badillo, Solicitor General,* and *Irene Curbelo, Assistant Solicitor General,* for appellant. *V. M. Sánchez Fernández, Jaime García Blanco, Yamil Galib Frangie,* and *Enrique Córdova Díaz* for appellees.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

—I—

On December 5, 1963, the Commonwealth of Puerto Rico instituted a condemnation proceeding for the use and benefit of the Land Administration, a governmental agency of the Commonwealth created by Act No. 13 of May 16, 1962. The

condemnation proceeding, addressed against properties belonging to the defendants-appellees, was instituted, pursuant to the authority conferred by said Act, and the General Condemnation Act in force.

It was stated in the complaint that the executive director of the Land Administration deemed it useful, necessary, and convenient in order to carry out the ends and purposes for which the Administration was created, to acquire the properties which were the subject of the same and specifically, for the purpose of devoting them to the preparation and efficient use of new areas for the necessities of the community, creating adequate reserves of land, to help the Commonwealth of Puerto Rico to accomplish its public policy, as well as for any other purposes leading to the accomplishment of the purposes of the Act, which created the Land Administration; and that the acquisition of the properties which are the subject of the action is of public necessity and utility and complies with the purposes of the Administration. The absolute dominion of two properties of 137.70 and 118.26 cuerdas was condemned, as well as the absolute dominion of another of 25.519 cuerdas and of 62.8528 cuerdas formed by the consolidation of four smaller parcels, together with their respective structures and accessions.

Together with the complaint a declaration for the immediate taking and delivery of the property was filed, signed by the Governor of Puerto Rico, in which it was stated that the properties were being acquired by the Commonwealth for the use and benefit of the Land Administration and in order to enable it to accomplish the purposes for which it was created and specifically, for the preparation and efficient use of new areas for the necessities of the community of the metropolitan area of San Juan and in order to develop projects of the Administration in agreement with state or federal agencies, with the municipal government or with private persons and to create adequate reserves of land to aid the

Commonwealth to carry out its public policy and for the accomplishment of any programs in pursuit of the purposes of Act No. 13 of May 16, 1962, which created the Administration. The sum of $1,381,676.00 was deposited in the court as just and reasonable compensation for the property acquired.

By order of December 5, 1963, pursuant to law, the absolute dominion title became vested in the People of Puerto Rico and the defendants were granted a term of 30 days for delivery of the property. After several hearings, by order of February 24, 1964, the court stayed the order for the physical delivery of the property until the condemnation case could be decided on its merits. The situation since that time to the present is that the People of Puerto Rico has held the dominion title to the properties from December 5, 1963, but so far they have not entered into the possession, use, and enjoyment of the same.[1]

By judgment of July 2, 1964, the court dismissed the condemnation complaint and vacated the order of December 5, 1963, vesting title. The Commonwealth filed the present appeal.

---

[1] In connection with the incidents on the physical delivery of the property the Commonwealth stated the following for the record: "Neither the Government's petition nor the Order of this Court vesting title in the State were directed to stop all of the operations of defendants on the lands condemned, and much less to produce the layoff of any of defendants' employees, to the extent that the State has made a clear and specific offer to pay for any improvements legally made by the defendant before the final delivery of the property." In conformity with the foregoing, the Government requested that the defendants be authorized, "while the Court decides the foregoing motion [for delivery], to continue operating the businesses that it is presently carrying on in the condemned land"; and that they be authorized "to carry out in the property work that will constitute useful improvements to the same and which do not interfere with the future use of said property by the Land Administration, improvements for which the State will pay a just price." (Hearing of December 24, 1963.) By order of same date the Court provided as stated above.

—II—

The background of the foregoing proceedings was as follows:

On August 29, 1962, the Land Administration submitted to the consideration of the Planning Board, pursuant to the provisions of the Act creating it, a project for the integral development of the metropolitan area of San Juan, and requested the Board to approve said project for the acquisition of lands (Scope of Project) according to a plan which was attached. It stated that in the indicated geographical area the Administration proposed to carry out works of a public character or to carry out other programs germane to the Land Administration Act and, as an integrated project, to make ready new areas for urban development of the Metropolitan Area under conditions that would secure the best balance with respect to the necessities of the future communities of the area, taking into consideration the standards of the Act, especially its § 7 (t), to secure for such area the best conditions of health, safety, comfort, recreational facilities, and other essential services. All of this was projected in such a manner that the project for the development in this zone could be channeled so that the same would favor the use of the lands indicated in the plan in a planned and efficient form. As fundamental grounds for the said petition to the Board, the Land Administration submitted the information and the data contained in their consultation. As they are of fundamental importance in the consideration of the issue, the document and the plan are attached as Appendix (A) of this opinion.

The Planning Board approved the Scope of the Project submitted by the Administration.[2]

---

[2] In its approval, the Board established the following facts:

1. The extraordinary economic growth of the Metropolitan Area of San Juan during the 1950–1960 decade was dramatically reflected in the rhythm of construction of dwellings, which increased from approxi-

In doing so, the Board stated that conscious of its responsibilities under the law and exercising them with a general purpose of guiding the development of Puerto Rico in a coordinated, adequate, and economic way, which according to the present and future necessities and human re-

---

mately 2,000 units annually at the beginning of the decade to 7,600 in 1960. In 1961, 6,400 dwellings were constructed and in 1962, 8,700.

2. From 1950 to 1960, 38,000 private dwellings were constructed in the Metropolitan Area, 70% of the total in the Island. In 1960 there were 148,000 dwellings compared to 108,000 in 1950. In addition, the Urban Renewal Corporation constructed during the decade some 7,548 units of public housing and developed 2,370 lots.

3. In addition another 3,000 cuerdas were required in the Metropolitan Area for industrial and commercial projects, highways, and other means of communication. Some of these installations already need to be enlarged or they need additional installations, because of lack of capacity.

4. In the past decade the Metropolitan Area of San Juan absorbed all of the populational growth had by Puerto Rico. Of a population of 509,000 which it had in 1950 it increased to 648,000 in 1960, despite the fact that during the period emigration was substantial. Anticipating a balanced regional growth, it is concluded that the Metropolitan Area shall probably grow from 648,000 in 1960 to 863,000 in 1970 and to 1,112,000 in 1980.

5. The demographic growth is accompanied by an economic growth and an increase in the family income. It is expected that the number of jobs in the Metropolitan Area will increase from 140,000 in 1950 to 180,000 in 1960, to 254,000 in 1970 and 326,000 in 1980.

6. The increase in jobs will be registered in industries having a high remuneration which utilize specialized labor, principally in professional, technical, and clerical jobs, yielding higher compensation. Of the total increment of employment provided for the next decade, 65% will be in the manufacturing industry and 33% in government, activities calling for skilled work.

7. The effect of this growth in employment in the income of the family points toward an increase of 80,000 in the number of families with an income having a purchasing power of $3,000 in the decade of 1960 to 1970. It is estimated that there were 50,000 families in 1960 with income of more than $3,000. In 1970, it is estimated that this number of families with a purchasing power of similar houses could reach 130,000, that is an increase of 80,000. The estimate for 1980 is of 206,000 of these families. Many of these families are young people with more specialized occupations, who will be entering the dwelling house market because they want their own home. The number of homes in the Metropolitan Area headed by men from 20 to 25 years, young men, was 20,800 in 1960.

sources, as well as physical and economical, would promote in the best way the health, safety, morale, order, convenience, prosperity, defense, culture, economic stability, and the general welfare of the present and future inhabitants, and such efficiency and economy in the process of development,

---

In 1970 it is expected that this number will be 42,000, and for 1980, of 47,000. This implies a growth in the demand for new homes.

8. It is calculated that the number of dwellings occupied in the Metropolitan Area will rise from 140,000 to 201,000 between 1960 and 1970 and to 274,000 for the year 1980.

9. In addition there exist other dwellings which because of mobility or other reasons may be vacant. In 1950 the number of vacant dwellings was 5% of the occupied ones. In 1960 it was 6% and it is estimated that it may rise to 7 or 8%, respectively, for 1970 and 1980. Considering the occupied and vacant dwellings, the number in the Metropolitan Area for 1980 is expected to be 296,000 dwellings. It is indicated that for 1970, there will be 70,000 dwellings more than in 1960.

10. Considering the demographic increment and the economic and employment growth, and the rise of the income of the family, it is indicated that in the Metropolitan Area it will be necessary to construct 80,000 private dwellings of the type in the present market, and between 1970 and 1980 some 90,000 additional ones will be required. In the 3 years from 1960 to 1962, 22,700 dwellings were constructed, of which 8,700 were constructed in the last year.

11. The study of the subdivisions constructed in the Metropolitan Area in the preceding decade reflects an average density of 6 dwellings per cuerda. Considering guides adopted by the Board, it is estimated that the average density will rise to 8 dwellings per cuerda. Consequently, the 170,000 dwellings which are required to be constructed for 1980 will need some 20,700 cuerdas.

12. To attain the object of public housing for 1970—families residing in the areas to be improved—it will be necessary to construct around 16,000 units of public housing and develop some 12,000 lots. An equal number will be necessary between 1970 and 1980. This total of housing units and lots will require 4,000 cuerdas.

13. For 1970 a level of 44,000 jobs in manufacturing are estimated, which implies an increase of 17,000 jobs. Between 1970 and 1980 an equal increase of 17,000 jobs is expected. The total of this increase will require around 850 cuerdas.

14. In order to take care of the increased demand for public services and utilities produced by the populational and economic growth anticipated, it will be necessary to dispose of another 3,170 cuerdas to construct highways, hotels, business establishments, parks, hospitals, government offices, and other services.

in the distribution of the population, in the use of the lands and of the public improvements as would tend to create conditions favorable to such ends, it considered the "implementation" of a program of development for the Metropolitan Area of San Juan indispensable. The program is to be based on the demand for lands which the stated population and economic growth heretofore mentioned will require in the Metropolitan Area of San Juan, which will permit the Planning Board to channel the growth of said area securing a development that is compact and contiguous to the areas already constructed, adequately provided with community facilities and services. Thus, the Board concurred with the Administration' and proceeded to approve the Scope of the Project of development submitted to it by the latter, according to the plan attached to Appendix (A). In consequence, the Board authorized the Land Administration to acquire by purchase, condemnation or in any other manner the vacant lands capable of subdivision comprised within the Scope of the Project for urban development, for making ready the necessary lands for a normal and compact development of this area.

---

15. As a result of all the foregoing it is calculated that in the Metropolitan Area up to 1980 some 28,720 cuerdas will be needed. Of this amount it is estimated that 3,000 cuerdas were developed between 1960 and 1962. This remaining area of 25,720 cuerdas constitutes the vacant land capable of urbanization in the Metropolitan Area included in the Scope of the Project submitted by the Land Administration.

16. During the decade 1950 to 1960, 10,000 cuerdas were urbanized which corresponded in their majority to private dwellings and public projects. The foregoing facts point to an average of 14,000 cuerdas to be urbanized in each one of the decades from 1960 to 1970 and 1970 to 1980.

17. As of October 1962 around 39,350 cuerdas were in use in the Metropolitan Area. This includes 3,900 cuerdas of private residential projects in the process of construction or with approved plans or preliminary development.* .

---

* Note: The data and estimates stated in the foregoing 17 paragraphs refer only and exclusively to the Metropolitan Area of San Juan. This includes the Municipalities of San Juan, Bayamón, Cataño, Guaynabo, Trujillo Alto, and Carolina.

The approval took place on January 23, 1963. The Board made the following provisions: "The right to use any of the properties included within the scope of this project in conformity with the uses authorized by the regulations and orders of this Board shall remain unaltered until the action for the taking in any legal form of said property in particular shall have been formally instituted."

On January 24, 1963, the Governing Board of the Land Administration, presided by the Governor, approved Resolution No. 5.[3] In it the Scope of the Project for development approved by the Planning Board (plan, Appendix (A)) was accepted. It declared that the property described in the Scope of the Project was useful, necessary, and convenient to carry out the ends of the Administration and to accomplish the purposes of the Act; it authorized the acquisition by purchase, condemnation or in any other form, under terms and conditions satisfactory to the Administration, of said property; and it authorized the Executive Director of the Administration to sign and execute any document that might be necessary to acquire by purchase, condemnation or in any other manner, these properties within the Scope of the Project.

In a previous meeting held July 10, 1962, the Governing Board adopted the following standard: That it would not acquire lands having a preliminary development in good faith, approved or under consideration of the Planning Board as of the date on which the bill which later became the Act

---

[3] Act No. 13 provided that the government and the powers of the Administration and its general policy shall be exercised by the Governing Board presided by the Governor; the Chairman of the Planning Board as its Vice-Chairman, and the Secretaries of Finance, Public Works, and Agriculture; the Director of the Urban Renewal and Housing Corporation, the Administrator of Economic Development, and two citizens designated with the advice and consent of the Senate. It can be observed that in the composition of the Board there were united the judgments of the different agencies and government entities who were called upon to make the findings respecting the purposes of the Act.

creating the Land Administration was filed. That good faith could be shown by acts which evidenced an intention to carry out immediately or in the immediate specific future the approved development. Prima facie any scheme of development filed in the Planning Board after approval of the Administration Act would not be considered to be in good faith.

Subject to the preceding standard, the meeting of the Governing Board on January 24, 1963, authorized the acquisition of innumerable properties belonging to different owners, among them those of defendant Rosso which are here in controversy.[4] Mr. García Santiago, Chairman of the Planning Board, stated for the record that there was no subdivision project respecting the properties of Mr. Rosso pending before the aforesaid Board. Neither was there any proposal whatsoever.

From February 1961 the Planning Board suspended approval in general of subdivision projects in the Metropolitan Area of San Juan until new guides could be adopted. The guides were proclaimed by Act No. 25 of June 8, 1962. When the bill creating the Administration was filed in the Legislative Houses on April 23, 1962, and when the said bill became Act No. 13 on May 16, said suspension was in force.

At its meeting on May 1, 1963, the Governing Board considered a reconsideration of its resolution requested by Mr. Rosso, which was denied, the original resolution of acquiring the properties being ratified. On this occasion, as at the preceding meeting, Mr. García Santiago stated that defendant's properties should be acquired because they formed part of a contiguous area. They could not be developed in-

---

[4] In addition to the 344.3318 cuerdas of Mr. Rosso, at that meeting there was authorized the acquisition of another 585.05 cuerdas owned by other persons. In subsequent meetings the Governing Board authorized the acquisition of properties in the Scope of the Project of development of the city of Arecibo, of the Scope of the Metropolitan zone of Mayagüez and of the Metropolitan Area of Ponce, and additional properties in the San Juan area.

dependently of the area which surrounds them, and that with their acquisition the area would be integrated so as to accomplish an orderly plan and obtain low-cost housing.[5]

A further basis for the foregoing condemnation proceedings was the following set of additional facts:

On May 16, 1962, the Legislative Assembly approved Act No. 13 which gave life to the Land Administration of Puerto Rico as a political body and government instrumentality. The reasons for this legislation are expressed in a full statement of motives wherein the Legislative Assembly declares the existence of the following facts:

(1) That the Commonwealth of Puerto Rico is one of the most densely populated areas in the world.

(2) That urban lands or lands with potentialities for urban development are monopolized and kept without use by their owners.

(3) That this creates an artificial shortage of land and raises the price of lands at a greater rhythm than that of the price of other properties and staple commodities.

(4) That the rapid rise in the price of land makes it impossible for persons of scarce or average means to purchase land in adequate areas and it compels these persons to construct their homes away from the immediate areas of the populations and far from their places of work and the places where they carry out their other activities.

(5) That the rise in prices of lands creates undesirable urban expansions, which in turn, creates serious financial

---

[5] The above conclusions are explained in the answer to the interrogatories submitted by the defendants-appellees (Exh. B for defendants). The orderly and integrated and economic development of an area of approximately 600 cuerdas, of which those of defendant-appellee herein are only a part, is explained and it is said that defendant's properties and the others condemned constitute a vacant area (pocket) between the constructed areas of Guaynabo and Bayamón, it being socially necessary and urgent that said area be developed in a balanced form taking into account the necessities of the community independently of the factors of costs and profits.

problems to the Commonwealth and the municipal governments because the costs of providing public services such as highways, water, sewer, public parks, public health, prevention and extinguishing of fires, police protection and other activities for the protection of life and property, essential for the development of the community, increase several times.

(6) That the rise in the prices of land increases the overhead cost of industrial and commercial establishments and, in consequence, their products are at a disadvantage in the competitive market, both local and outside of Puerto Rico.

(7) That the relatively rapid rise in the price of the lands increases inequalities in income because the unused lands in Puerto Rico, both urban and rural, are controlled to a great extent by a small number of persons.

(8) That the rise in the price of land affects furthermore, or prevents, the "implementation" of the master plans, is an element of worry for the public conglomerate and constitutes a grave problem.

(9) That in the public interest the excessive and disproportionate increase in the market price of the land should be avoided as soon as possible.

Having declared the existence of said evils, the Legislative Assembly stated:

(a) That the ever increasing price of land cannot be controlled, nor can the problems created by it be solved, by the present instruments of the governments of the Commonwealth and the municipalities.

(b) That the levying of taxes, and the regulations covering physical planning, are insufficient.

(c) That the regulation in connection with subdivision and zoning operates prospectively for undeveloped areas and are incapable of eliminating nonconforming legal uses of lands.

. (d) That the regulation respecting the subdivision of lands is not sufficient: (i) neither to control the expansion of the limits of cities nor (ii) to control unarticulated and inadequate expansions of cities.

Confronted with the inefficacy of the means and manners now at hand to curb the evils announced, the Legislative Assembly declared:

(a) That in order to control the grave problem of the rise in the prices of land the greatest utilization of public funds may be made, authorizing whenever necessary, the obtaining of private property.

(b) That the Legislature finds that the provisions of Act No. 13 of May 16, 1962, which created the Land Administration, be adopted as a necessity of public policy.

(c) That the reserve of lands authorized by the provisions of said Act is of itself a public purpose.

. (d) That it is the intention of the Legislative Assembly that the activities of the Land Administration created by the said Act: (i) promote in a planned and efficient way the welfare, the economic liberty, and the social justice of the present and future inhabitants of Puerto Rico, through the efficient use of the lands and the preparation of new areas in any part of Puerto Rico, in order to secure a better balance between the necessities of future communities in harmony with the economic and geographical situations; (ii) preserve the historical values and the natural values of the land; (iii) insure the best conditions of health, safety, and social life; larger recreational facilities, greater and better essential services; (iv) avoid the concentration of lands for speculative purposes, in the hands of any one person; (v) develop programs for the acquisition of the necessary lands and to channel all types of projects, by itself or together with other governmental agencies, of the United States or with private entities; (vi) promote action leading

to a better utilization and exploitation of the lands on the basis of more reasonable costs to the benefit of the welfare of the community, particularly in the zones of potential development; (vii) establish adequate land reserves to aid the Commonwealth in the execution of its public policy of industrial, commercial, and housing development, to provide public services so that there may be an orderly development in harmony with the master plans and to help it to perform more effectively its governmental responsibility of maintaining the health, safety, and the welfare of the inhabitants.

(e) That it is the intention of the Legislative Assembly that the Administration exercise all the powers necessary (i) to carry out its activities; (ii) to acquire any property, right or servitude which favors the development, exploitation, and preservation of open areas in their natural state, protect the bodies of water, preserve the soils and forests, preserve the beauty of the places devoted to public use; to protect from the effects of floods and facilitate the use and development of areas reserved for projects of public interest; (iii), to dispose of its immovable property subject to the conditions, with the limitations respecting its use and exploitation that may be necessary and convenient, preventing that the use given to said property may tend to create or maintain undesirable conditions or conditions adverse to the public interest; (iv) to establish, when it sells or in any other way disposes of its property, restrictions limiting the profits to be gained by the acquirer from the price to be paid by the public respecting said land; (v) to develop projects for the rehabilitation of lands, through drying, drainage, filling, irrigation or through any other adequate method to increase the utilization of lands.[6]

---

[6] The Governor of Puerto Rico sent to the Legislative Assembly on April 23, 1962, a bill which later became Act No. 13 accompanied by his special Message, in which he suggested, given the nature of the proposed

Thus in conformity with the broad declaration of intention and legislative purposes, the Legislative Assembly conferred powers upon the Administration.—Sections 7, 8, 16 of Act No. 13. Among them the full power to execute the public policy of the Commonwealth as declared in the statute.

legislation that might produce undesirable speculations, a rapid legislative action to take place in the shortest possible period compatible with the democratic and full discussion of said bill.

The Governor stated that the inflation in the price of lands in San Juan and in other urban zones and parts of the country, constituted a grave problem for families of low or moderate income, for industrialization and for the development of the public works and the orderly growth of cities and towns. That this condition is contrary to the best public interest because:

1. The execution of housing projects for families of low or moderate income is made difficult.

2. The entire program of public works is made expensive, which is paid by all of these taxpayers.

3. The construction of factories for the industrialization program is made expensive.

4. Cities in their growth are thrown out of orbit when they find they are obliged to grow "in rabbit jumps" as the lands of relatively low prices become available at a considerable distance from the constructed areas. This in turn aggravates the problem of transportation and that of the rendering of efficient and economic public services to the new neighbors, and in general problems are created which as a whole are of great magnitude, complexity, and gravity.

The Governor recommended that legislation be approved:

a. To curb the reckless rise in land price.

b. To eliminate the practices of speculation in lands which only benefit a few to the prejudice of the totality of the growing population.

c. To assure the development of housing at low and moderate costs for families which do not yet have their own homes.

d. To insure a reasonable cost for the lands necessary for industrial and commercial purposes which are considered indispensable for the life and progress of Puerto Rico.

e. To insure the creation of an inventory of land for all public works that may be realized in the course of, at least, the next ten years.

f. To insure that the growth of our cities respond to the greatest general good.

A fuller understanding of the problem which preoccupied the Government and its gravity is complemented with the facts, data, statistics, socioeconomic attitudes, profiteering tendencies, etc., revealed in the full and moving legislative debates on the Bill that became Act No. 13. See 15-3 Journal of Proceedings 1012 *et seq.* (Senate, May 3, 1962); page 1042

The power of condemnation having been conferred by the Commonwealth upon the Administration by delegation, the Legislative Assembly itself declared· that all property necessary for complying with the purposes of the Act, and all works or projects of the Administration were a *public utility*.—Section 13.

It was an express mandate of the Legislative Assembly to the Administration, among other expressed directives, that whenever the Administration sold or in any other manner disposed of its property in order that the grantee should develop the same in subdivisions or any other type of project implying a subsequent sale to private persons, it *shall* include a restriction limiting the profits with respect to the land and all other costs of the project, to be obtained by the grantee. —Section 7(z).

The Legislative Assembly expressly permitted the Administration to dispose of its property or of any right or interest in the same for a lower price than that which it had paid for it [at a loss], if by doing this the purposes established in the Act would be accomplished.

Unquestionably, Act No. 13 possesses all of the characteristics of emergency legislation—*cf.* § 7(c), (e), (o); §§ 9, 11, 14(g), 18—its provisions being commensurate with the gravity of the problem to be attacked, for the execution of which the Legislative Assembly immediately appropriated huge sums of public funds. A harsh remedy for harsh evils.

—III—

It is against the fact of the real existence of everything hereinabove stated, that we should focus the issue at bar

*et seq.* (House, May 3, 1962). See the Joint Report on the Bill submitted by the Finance and Public Works and Lands Committees of the Senate and of the House. Journal, *id.* pages 1007–1012; 1047–1052.

Luis F. Negrón García, "*Impacto del Aumento en el Costo de las Tierras en Puerto Rico: La Administración de Terrenos como Instrumento del Urbanismo,*" XXXII-4 *Rev. Jur. U.P.R.* (1963).

and pass legal judgment on the decision of the trial court.

In the trial court the defendants-appellees made a frontal attack on the constitutionality of Act No. 13.[7]

The trial court made many pronouncements with a strong

---

[7] Among other challenges they alleged:

(a) That Act No. 13 is unconstitutional and void as constituting an unlawful delegation by the Legislative Power of the power of condemnation and because it does not establish any standard or rule, just and reasonable, for the exercise of said power, in violation of the Constitution of the Commonwealth and that of the United States.

(b) The condemnation by virtue of this Act is not for a public end or purpose. It pursues a purpose of private nature aimed at dispossessing the defendants of their right to property without the existence of any reasons of utility, emergency or public necessity whatsoever. For said reason, Act No. 13 violates their constitutional rights under the above-mentioned Constitutions.

(c) Act No. 13 is unconstitutional and void because it violates the congressional provision that limits the holding of land by corporations to 500 acres, and because it violates the constitutional provision that forbids a corporation to engage in the business of purchase and sale of real estate.

(d) Act No. 13 is unconstitutional because it violates the right to equal protection of the laws.

(e) Because it authorizes the use of public funds for a private purpose.

(f) Because it deprives defendants of their property without due process of law.

The defendants made other attacks, this time on the procedure itself now within the frame of the provisions of Act No. 13 and against the authority of the officers to institute the action pursuant to the Act itself. We hold from this moment that in the light of the record and of the facts, these other attacks are without merit and cannot be sustained. Also without merit are those referring to the unconstitutionality of Act No. 13, such as delegation of powers without adequate standards, the holding in excess of 500 acres, transactions in real estate, the denial of equal constitutional protection of the law. In the granting of powers and faculties to the Administration to exercise its functions, specifically the power of condemnation, Act No. 13 is replete with standards and basic directives to be observed. In 1962 the congressional provision respecting 500 acres was not in force in Puerto Rico. Nevertheless, see *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316 (1st Cir.), *cert. den.*, 329 U.S. 772, and the express provisions of § 14 of Art. VI of the Constitution of the Commonwealth.

Still to be considered and adjudged is the challenge to the constitutionality of Act No. 13 by reason of the alleged inexistence of a public end or purpose and the alleged appropriation of public funds for private purposes.

implication that Act No. 13 is unconstitutional.[8] Nevertheless we find its decision or *ratio decidendi* in the following conclusions of law: ·

"The sufficiency of the averment relating to the contemplated use, as well as the public nature thereof, having been attacked, it is the duty of this Court to determine and decide,

---

[8] Example: The court stated, and it is contended by the defendants-appellees, that Act No. 13 does not define the public policy of the State, that is, the means which the Legislator adopted in order to confront the problem, and that the preoccupation is caused by "the total absence of a clear and definite definition of the specific public policy of the State in the face of evil, which is attempted to be cured."

The reading of the statute convinces us that the contrary is true.

Under § 9 of Art. VI of the Constitution of the Commonwealth— Public funds and properties shall only be disposed of for public purposes . . . and in every case by authority of law—was understood by the trial court to mean that "the total absence" of appropriate guidelines in the Act for the disposition by the Administration of its properties and funds "permits a situation which destroys its constitutionality."  ··

We do not believe that such a "total absence" of standards exists. We understand, on the contrary, that the Act contains sufficient directives to the effect that the disposition of its property and funds by the Administration should always lead to a compliance with any of the ends and purposes directed by the Legislative Assembly, and should not respond to others.

The trial court declared, and it is so contended by the defendants-appellees, that as no judicial review was provided for the acts of the Administration "except in cases of condemnation such as the present one," the constitutionality of Act No. 13 "is very tenuous indeed."

Assuming that the proposition of law is correct, sight is lost here of the fact that the Land Administration is an almost totally executive organism and not a quasi-judicial one or one having the function of adjudicating controversies in the administrative sphere. It can be sued—§ 7(f)— and like any other executive function its acts in the course of its businesses are subject to the ordinary judicial jurisdiction.

The court concluded that the provisions of Act No. 13 which authorize the acquisition of lands "for reserve" are permeated with "equal or greater taints of unconstitutionality."

It must be remembered that in view of the nature of the problem or the evil which it wanted to attack and dissolve, the Legislative Assembly declared that the "reserve" of land constituted, *of itself*, a public purpose. Before the problem at hand, it cannot be contended that this was an arbitrary declaration or one without any basis in reason.

Other holdings of the court were that the "ambiguity" of Act No. 13 and its lack of standards encourages the Administration to be tempted to acquire properties and to become another speculator in search of a

definitely, whether the purpose stated constitutes or not a public use. This determination requires that the Court consider the particular facts and circumstances present in this case. [Citation]

"The question of public use cannot be approached dogmatically and should be considered in a realistic manner, de-

profit, to condemn them "for the only purpose" of making a profit with the increase in the value of the land, as well as to incur in other practices outside their mission for want of any restriction on their extraordinary powers in the use and disposition of their property. That "the absence of a judicial or equitable remedy," the lack of standards in the acquisition, use and disposal of its property together with the "possible speculation" in lands to which the Act lends itself, "stamps as unconstitutional" the statute.

With respect to the purposes of the Legislative Assembly, the Act contains sufficient standards. Should the Administration tomorrow pervert its reason for existence, that would be a problem for the Legislature. Speculation by the trial court that the purposes of the Law might be subverted, should not be a bar at the present time with respect to the sovereign exercise of the power of condemnation.

The trial court concluded that the Scope of the Project and "the evident intention" of § 14, paragraph (f) "of excluding all increment in the valuation of the lands to be acquired" permits and authorizes the Administration to condemn for that lower price denying just compensation, the statute itself and the Scope of the Project, being contrary to the Constitution as they deprive persons of property without due process of law.

Assuming that § 14(f) provides the foregoing, the problem is one of just compensation (not involved in this appeal) of the final responsibility of the Judicial Power independently of the Legislature, but would be no bar to the exercise of the sovereign power of condemnation.

The trial court considered other matters, such as that no master plan existed; the Planning Board was not justified in rejecting the consultation of the defendants for the development of their lands; nor were the defendants' lands "urbanizable vacant lands."

The Scope of the Project approved by the Planning Board constituted a master plan in itself. The refusal of the Board to approve the consultations or projects of the defendants was not reviewable in these proceedings in which the Board was not a party, nor can the fact that a proprietor is carrying out works or has projects in mind with his property be an obstacle to the exercise of the sovereign power of condemnation, but he has a right to his just compensation. Within the meaning which for purposes of the Act the Legislative Assembly gave to the concept "vacant property," and within the meaning which the Planning Board and the Governing Board of the Administration gave to it, defendant's lands and those of the other owners integrated in a project were vacant lands:— an undivided area located between other areas already subdivided.

ciding each case on its own merits. The term 'public use' cannot be defined in contraposition to the concept of 'private use.' [Citation] The concept 'public use' is not susceptible of a precise definition. [Citation]

"In the interpretation and application of the term, the so-called liberal doctrine prevails in this jurisdiction. The concept 'public use' was adopted in the Constitution of the Commonwealth of Puerto Rico with the meaning impressed upon it by previous judicial decisions. [Citation] Laws of condemnation, as well as the statutes which delegate the legislative power or which interfere with the right of property, nevertheless, should be restrictively construed." [Citation]

We agree—even though with the observation that the interpretation should always be the one which leads to an efficacious compliance with the ends or purposes of the legislature, not necessarily a restrictive interpretation—that the foregoing propositions of law are substantially correct.

The trial court continued and it is supported by the defendants-appellees:

"Concomitantly to the problem of public use there arises the question of public utility and necessity in every condemnation. Section 13 of the Act of the Administration declares that all properties which are necessary 'to carry out the purposes of this Act' are of public utility as well as all works or projects carried out by the Administration. This declaration requires an analysis of its legislative precedents.

. . . . . . . .

"There is a marked difference between the declaration of public utility which appears in the law creating the Administration and the declaration authorized by the General Condemnation Act. The declaration of utility contained in the Act of the Administration deprives the citizen of the rights which favored him in the General Condemnation Act. In effect under the latter the declaration of public utility requires a previous hearing in all cases for the interested parties 'respecting the necessity for a better public service and a better execution of

the work to that end'. . . .* The Legislature could not have had before its consideration, nor has this Court, any indication whatsoever revealing what was the 'public use' to which the Administration intends to devote the properties it seeks to condemn.

．　　　．　　　．　　　．　　　： ：　　　．　　　．　　　． ．

"The 'necessity' that justifies a condemnation is that which presently exists or which may exist in the immediate future and its existence is necessary both for the condemnation and the public works contemplated. A future, indefinite, remote, or speculative necessity is not sufficient. [Citation] . . . .

"Rule 58 of the Rules of Civil Procedure, as already stated, requires a specific averment of the public use . . . .

"There is no doubt that the averment respecting the public use made in the complaint is ambiguous and vague. Of equal ambiguity and vagueness are resolutions number five and six of the Governing Board of the Administration . . . . The answers of the Commonwealth to the requests for admission and

---

\* The Condemnation Act of March 12, 1903, provided in its § 2 as amended, that private property may be taken or impaired for legal purposes when it shall have been declared to be of public utility by the Governor or the officer or the agency which he may designate. The declaration of public utility shall be made by the Governor or the officer or agency by him designated, after a hearing in every case, of those persons who are interested in being heard with respect to the convenience of said declaration and with respect to the necessity for the better public service and better execution of the purpose of the work.

It is conceivable that the foregoing does not deprive the Legislative Assembly itself, where the sovereign power of condemnation resides in its origin, from making for itself in the statute a declaration of public utility even with more authority than that made by an officer, and without any hearing being necessary. At any event, if the utility should not be public, the declaration may be attacked judicially by the party affected in the condemnation proceeding whether in the same manner as provided by the General Condemnation Act, or by the Legislative Assembly itself, as in Act No. 13. The lack of previous hearing respecting the declaration of public utility is not a constitutional vice which implies a violation of due process of law. *North Laramie Land Co.* v. *Hoffman,* 268 U.S. 276, 284; *Georgia* v. *Chattanooga,* 264 U.S. 472, 483; *Bragg* v. *Weaver,* 251 U.S. 57, 58 and cases there cited; *Sears* v. *City of Akron,* 246 U.S. 243, 251.

According to the evidence, in this case there was also a declaration of public utility with respect to the specific properties of the defendant made by the Governing Board of the Administration.

the interrogatories submitted to it by the defendants are offered in evidence as well as the statements in open Court by counsel for the condemnor, acknowledge that the condemnation is not for a *specific public use* but rather *for the general ends and purposes framed by the act creating the Administration.* [Emphasis supplied.] Private property and, as a corollary, the lands to which this litigation refers, cannot be condemned for an unrevealed use. [Citation]

"No public use according to law having been alleged or proved in this case, this Court must decide, and hereby decides, that no public necessity whatsoever justifying the acquisition by the Commonwealth of defendants' property exists.

"Under these facts and circumstances we hereby should and do conclude that the proceeding for the condemnation of the properties in question has not been carried out in conformity with pertinent legislation. The vagueness of the statute, of resolutions Nos. 5 and 6 of the Governing Board of the Administration; the insufficiency of the proof; the absence of any master plan whatsoever, and the regulation governing the Administration; the actions of the agencies concerned; the lack of a definite public use and the lack of a necessity for the acquisition which is sought, violate due process of law and invalidate the present action."*

With these pronouncements the condemnation proceeding was dismissed and the title of property invested in the Commonwealth of Puerto Rico on December 5, 1963, was

---

* Upon organizing itself, at its meeting of July 3, 1962, the Governing Board adopted a Regulation for the functioning of the Administration. The trial court rather has in mind a regulation of substantive standards. On June 20, 1966, the Administration filed in the office of the Secretary of State a Regulation which contains standards with respect to the disposal of lands, published in the Bulletin of Puerto Rico, Vol. 5, No. 6, on June 30, 1966. 23 R.&R.P.R. §§ 311f–1 to 311f–103.

The appellees assign great importance to the mentioned lack of a "Regulation" of substantive standards. An examination of the Minutes of the meetings of the Governing Board (Exh. C of defendants) shows, in the discussion and consideration of the resolutions adopted, that it was acting in response to the basic standards of the Act, with a view to complying with its purposes, and not its whims.

vacated, ordering its cancellation in the Registry of Property.

We cannot agree with all of these holdings. The approach of the trial court, which did not see any public use or interest in this, is to a certain extent out of focus in present times. It responds to yesteryear which was characterized by the limited and restricted function of merely governmental acts and acts of administration of public affairs, of Government, as the only duty of the state to the community and those governed. It also represents the stale individualistic concept of the exclusive right to the use, enjoyment, and disposal of property by the owner, which no longer prevails, when it is necessary to confront it with the common good.

—IV—

In a comprehensive statement presented to us by the Solicitor General concerning the social, economic, and technical-professional aspect of urbanism, the universal phenomenon which nowadays perturbs societies, especially those in the process of development, he cites several authorized opinions of noted persons and entities who are acquainted with the problem. From the Report of the Conference of the United Nations for the Application of Science and Technology for the Benefit of the Underdeveloped Areas, Vol. V, "People and Living", 1963, Publications of the United Nations, p. 167, he quotes:

The lack of the requisite legal power to promote development and to channel it in desirable directions often handicaps urban planners and officials in free enterprise and mixed economics particularly where it concerns land use and expropriation . . . . Planners and urban land economists agree widely that government ownership of land in developing areas offers the most effective means of control, avoids the undesirable effects of private speculation in land and ultimately secures a source of revenue for financing government services . . . . Ownership of the land should be firmly retained in public

hands . . . in the developing countries the Government must acquire the land.

These other citations furnished to us by the Solicitor General show that the approach of Act No. 13 of 1962 and the means and ways conceived in it are not an innovation or mere invention:

From John Graham, Jr., "Housing in Scandinavia", The University of North Carolina Press, 1940, pp. 3, 7.

This problem of land acquisition is widespread today. Our American cities, in their rapid growth, have been more concerned in land transactions with the profits accruing to individuals than with any consideration of community advantages. Speculation in land values and unrestrained exploitation have been responsible for the artificial and excessive land prices. Comparing, the author states that over a period of years Copenhagen, Helsinki, and Stockholm have been steadily acquiring parcels of land, principally within and around their limits. The purpose behind this land ownership program, as expressed by the Stockholm authorities, is to secure sites for housing purposes and *to influence the price of land* so that unbridled speculation will be prevented. It will give the city the opportunity after a long span of years to change the city plan, to obtain centrally located sites for municipal needs, and finally, to permit easy and inexpensive access to those parts of the city which might have developed into slums.

He continues:

To declare that the social value of land should be recognized is not to indicate that it should be treated as communal property. Rather, it is to recognize that the community has the prior right in determining, both for the present and the future, the proper use of land, whether its use is to be for purposes of housing, manufacturing, commercial, or agricultural use, forestry or public parks. It may thus be said that the proper mission of land is to function as a catalytic agent, assisting capital to develop resources and ministering to individual and community needs, but without in any way losing its identity as land or relinquishing any part of its inherent value. Therefore, in a social conception of land value, what the individual

owns is not the actual land but the privilege of putting that land to its best use as determined by society.

This concept of the social value of land is a far cry from the idea that land is a commodity lending itself readily to speculation and exploitation for private gain and subject to the capricious fluctuations of capital. Without destroying the idea of private property, Scandinavians emphasize the social value of land in their extensive and farsighted land acquisition policy.

Among the conclusions submitted to us by the Solicitor General of the Conference at Harvard in 1962 on the problem of urbanism, with the participation of prominent persons, are:

Define metropolitan area; define a master plan; define "public purpose" to include any purpose deemed by the appropriate metropolitan authority to be essential for the realization of the master plan; acquire by condemnation, when necessary, land anywhere within the metropolitan area for a public purpose as above defined; permit all owners of real property to use such property only in accordance with the master plan. Such land could then be put to its best possible use in the interest of the whole community without regard to the acquisition cost of any particular parcel.

And from Guy Greer, Walter Gropius, and Martin Wagner he cites:

Civic shortsightedness and lack of group vision in handling urban land is one of the major causes of our failure to originate the new and better town pattern so badly needed. The land has been traded across the counter of real estate offices as though it were a commodity. But land is not a commodity; for, unlike buildings, it cannot be produced nor moved nor replaced. Land is of such a peculiar nature that it should be owned by the communities which will become increasingly the constant element of our society, with a more or less fluctuating population. If the community would gradually redeem land, it could control the entire area necessary for its development. Such a large scale public land policy is indispensable for a sweeping improvement of our old cities, for a change from a suffocating congestion to

the spaciousness of a future green city. "The Problem of Cities and Towns" 87, 93, 110, 113.

Also the Solicitor General offers us these other criteria from Charles M. Haar, "Land Planning Law in a Free Society" 127, Harvard University Press, 1951:

The reason is that public ownership of land has two distinct types of advantage. Ownership by the State is the most direct method of eliminating the conflict between the private interest in putting a given piece of land to the most profitable use for which it can find a market, and the public interest in ensuring the best use of all land irrespective of monetary return. The social costs of speculative subdivision have led some American experts to the conclusion that the only hope of efficient and economic city growth is public ownership of peripheral areas. By buying land in the line of development, municipalities have the power to guide the direction of their future growth. It is no longer dependent on the whim of any individual. Moreover, the disparate landowners may have neither the capital nor incentive to develop. And there remains always the problems of the holdout who may block that plan which is most to the community advantage.

So far the citations of the Solicitor General.

The concepts stated above are not peculiar to the Nordic and Anglo-Saxon communities which are today extensively socialized. In the shake-up of social conscience by Leo XIII; although a "natural" right to private property is acknowledged, the social sense of the same is emphasized. *Rerum Novarum*, 1891. Referring to that Encyclical of Leo, John XXIII states:

"As is generally known, in those days an opinion widely prevailed and was commonly put into practice, according to which, in economic matters, everything was to be attributed to inescapable, natural forces. Hence, it was held that no connection existed between economic and moral laws. Wherefore, those engaged in economic activity need look no further than their own gain. Consequently, mutual relations between economic agents could be left to the play of free and unregulated

competition. Interest on capital, prices of goods and services, profits and wages were to be determined purely mechanically by the laws of the marketplace. *Every precaution was to be taken lest the civil authority intervene in any way in economic affairs.* During that era, trade unions, according to circumstances in different countries, were sometimes forbidden, sometimes tolerated, sometimes recognized in private law. [Emphasis supplied.]

"Thus, at that time, not only was the proud rule of the stronger regarded as legitimate, so far as economic affairs were concerned, but it also prevailed in concrete relations between men. Accordingly, the order of economic affairs was, in general, radically disturbed."

And later:

"Private property, including that of productive goods, is a natural right possessed by all, which the State may by no means suppress. However, as *there is from nature a social aspect* to private property, he who uses his right in this regard must take into account not merely his own welfare but *that of others* as well." (Italics ours.) *Mater et Magistra,* 1961.

Referring also to the evaluation of the social doctrine of *Rerum Novarum,* made forty years later by Pius XI— *Quadragesimo Anno,* 1931—Pope John XXIII observes that Pius XI took this occasion to clarify certain points on which certain doubts had arisen and in order to develop his social Christian thoughts according to the new circumstances of the times, and he says:

"For at that time, some were in doubt as to what should be the judgment of Catholics regarding *private property,* the wage system, and more especially, a type of moderate socialism.

"Concerning private property, our predecessor reaffirmed its natural-law character. Furthermore, he set forth clearly and emphasized the social character and function of private ownership." (Emphasis supplied.)[9]

---

[9] Of course, historically there has existed a divergence of philosophical opinion with respect to whether the right of individual property is a natural right or a right of God, as understood by the Church, or not.

. . . . . . . .

"Pius XI was not unaware that, in the forty years that had elapsed since the appearance of Leo XIII's Letter, historical conditions had. profoundly altered. In fact, unrestricted competition because of its own inherent tendencies, had ended by almost destroying itself. It had caused a great accumulation of wealth and a corresponding concentration of power in the hands of a few who *are frequently not the owners, but only*

---

Montesquieu and Bentham believe that it is not. The former states:

"Thus as men have renounced their natural independence to live under political laws, they have also renounced the natural community in order to live subject to civil laws. The first of these laws acquired for them their liberty, the second their property."

Thus, although he admits a first state of common property in its origin—as is observed by Gutiérrez Fernández—he bases property which owes its origin exclusively to civil laws upon the renunciation of that state. And Bentham:

"In attempting to find out the exact notion of property, we shall see that there is no natural property; that it is solely a work of the laws. The idea of property consists in an expectation established in the possession of the ability to obtain this or that advantage of the thing according to the nature of the case. However: This persuasion, this expectation cannot be anything else but a work of the law. I cannot count on the enjoyment of that which I look upon as mine, except under the promise of the law, that it guarantees it to me . . . . The property and the law were born together and shall die together. Before laws existed, there was no property; remove the laws, and all property ends." Gutiérrez Fernández, II *Códigos o Estudios Fundamentales sobre el Derecho Civil Español* 53, 54 (1868).

The provisions of § 5 of the Political Code of 1902 also appeared to us to be in harmony with the legalistic concept of the right of property:

"The *primary and final* right to all of the immovable and movable properties, within the limits of the territory of Puerto Rico, not belonging to the United States, *resides* in the people of said territory." See §§ 6 and 9, Political Code.

"As is known, by historical investigations, the primitive Nomad peoples did not recognize any individual right to lands. The cultivation of the land was unknown and each group or tribe would establish itself indistinctly in one place or another according to their convenience, inasmuch as the lands were not considered to be subject to appropriation; but when the agricultural period arrived real property was on principle recognized exclusively in favor of the State. It is because of this original right that the State preserves over all of the territory of each country that which is in law termed *eminent domain.*" (Italics by the author.) José López del Valle, Esquire, *"Origen y Desarrollo del Registro de la Propiedad": La Toga*, published by the Bar Association, Oct. and Nov. 1967.

*the trustees and directors of invested funds, who administer them at their good pleasure.'* " (Italics by the author.)

"Therefore, as the Supreme Pontiff noted, *'economic power has been substituted for the free marketplace. Unbridled ambition for domination has replaced desire for gain; the whole economy has become harsh, cruel,* and relentless in frightful measure.' Thus it happened that even public authorities were serving the interests of more wealthy men and that concentrations of wealth, to some extent, achieved power over all peoples." (Italics by the author.)

As remedies, among others:

". . . the interests of individuals or of societies especially must be harmonized with the requirements of the common good . . . civil authority should reassume its function and not overlook any of the community's interests."

As motives:

". . . there be established a juridical order, with appropriate *public and private* institutions, inspired by social justice, so that *those who are involved in economic activities are enabled* to carry out their tasks *in conformity with the common good."* (Italics ours.)

"It is certain, however, as our predecessor noted, that the right of private property is from the natural law itself. Nevertheless, it is the will of God the Creator that this right to own property should in no wise obstruct the flow of *'material goods created by God to meet the needs of all men, to all equitably, as justice and charity require.'* " (Italics supplied by author.)[10]

---

[10] With respect to the intervention by the public power in the economic field, the Encyclical observes that in this field the public powers should be actively present "to increase output of goods and to further social progress for the benefit of all citizens." Its action should be inspired in the principle of its subsidiary mission. The public powers, responsible to the common good, must feel responsible "that they intervene in a wide variety of economic affairs, and that, in a more extensive and organized way than heretofore, they adopt institutions, tasks, means and procedures to this end."

But it recognizes the principle that the presence of the State in the economic field, no matter how expanded and profound it may be, should

And speaking for itself for the era of today, Mater et Magistra, with respect to the naturalistic concept of the right of private property, says:

". . . For the right of private property, including that pertaining to goods devoted to productive enterprises, is permanently valid. Indeed, it is rooted in the very nature of things, whereby we learn that individual men are prior to civil society, and hence, that civil society is to be directed toward man as its end."

He thus adopts the observations of Pius XII, 1944, to the effect that when the Church defends the right of private property, it in no way strives to uphold the present state of affairs, nor "accept the patronage of the affluent and wealthy while neglecting the rights of the poor and needy." The institution of private property should "safeguard the rights of the human person and at the same time make its necessary contribution to the establishment of right order in society."

"It is not enough," continues the Encyclical, "then, to assert that man has from nature the right of privately possessing goods as his own, including those of productive character, unless, at the same time, a continuing effort is made *to spread the use of this right through all ranks of the citizenry*." (Italics ours.)

---

not be aimed to reducing the sphere of liberty in the initiative of private citizens, but rather that it should aim to guarantee that sphere the greatest possible breadth, "so long as the basic rights of each individual person are preserved inviolate" which implies that the free development of the activities of production is permitted and empowered in the economic system. Where there is a want of personal initiative of private persons there exists stagnation of the economic sectors destined to produce both consumer goods and the service of material necessities, as well as the requirements of the spirit. "Where, on the other hand, appropriate activity of the State is lacking or defective, commonwealths are apt to experience incurable disorders, and there occurs exploitation of the weak by the unscrupulous strong, who flourish, unfortunately, like cockle among the wheat, in all times and places."

(Citing from Pius XII) :

". . . the dignity of the human person necessarily 'requires the right of using external goods in order to live according to the right norm of nature. And to this right corresponds a most serious obligation, which requires that, so far as possible, there be given to all an opportunity of possessing private property.' On the other hand, the nobility inherent in work, besides other requirements, demands 'the conservation and perfection of a social order that makes possible a secure, although modest, property to all classes of people.' "

.    .    .    .    .    .    .    .

Finally:

"Obviously, what we have said above does not preclude ownership of goods pertaining to production of wealth by States and public agencies, especially *if these carry with them power too great to be left in private hands, without injury to the community at large.*' " (Italics supplied by author.)[11]

---

[11] Castán, in telling us that a principle of law favorable to the social sense of property has been framed, comments that the rigidly individualistic character of property in Roman Law has been considerably exaggerated, as according to a note by Stolfi, there existed in that law interesting restrictions and prohibitions founded on the *public interest,* and if those which modern civilization has introduced were lacking this is due to the fact that in those times there was no need for the services which new inventions and great industry have created in our days.

Citing from Stolfi, II *Diritto civile* 221:

"After the European war the change produced in the conditions of life and spirit of the people has made to appear as *illogical and unjust* the long protection that the law granted the proprietor. Truly, it is repugnant to general sentiment that the proprietor of the land may plant it with flowers *or leave it capriciously uncultivated,* when the nation is in necessity of bread or other indispensable articles of life; that the villagers can be evicted from the land which they have tilled with their sweat, because the lease has expired and they do not want to be subject to the odious pretentions of the proprietors; that the hundreds of thousands of citizens of the populous city should be dependent on a few hundred proprietors, for the satisfaction of one of the most essential necessities of life, *such as the home,* to which are also connected the *freedom of locomotion, of work,* etc. The new and increased necessities of individuals have shown in their profound gravity these formidable problems, which formerly were hardly apparent." (Italics ours.)

And from II *"Principles d'Economie politique"* 414 *et seq.* Castán cites from Schmoller:

In Spain, the social concept of private property for the common benefit is deep-rooted. Castán, *op. cit.*, page 100, comments that the individualistic concept of private property as an unlimited right over the thing is today entirely discredited. It is deemed to be considered "as a *subjective* right to which a *social function* is linked."

In the fundamental laws of the Spanish State, private property is recognized and protected by the State—*Fuero de los Españoles*, Art. 30—but the State assumes the task of multiplying and making available *to all Spaniards* the forms of property *vitally* linked to the human person, the *family home*, the tract of land and the instruments or working tools for daily use—*Fuero del Trabajo, decl.* 12. All the forms of property *are subordinated to the Supreme interest of the Nation*, whose *interpreter* is the State, or in other words, "the necessities of the Nation and the common good" —*Fuero de los Españoles*, Art. 30. The fundamental law of the Principles of the Movement of 1958 subscribes to the foregoing guidelines, but *emphasizes the social end* of the right of property, in declaring that it acknowledges "private property in all of its forms, as a right *conditioned* to its social function." *Op. cit.*, page 91.

Don José Castán observes that the classic forms of *"taxation"* or of *"condemnation"* are no longer sufficient, but rather that the reconciliation of the right of property with

"Every superior development of the individuality presupposes the guaranteed superior development of a certain individual sphere of liberty and, consequently, of property. But, at the same time, every superior constitution of the State or of society implies a *common property* and *certain rights of the community over individual property*. The periods of great social progress, of growing cohesion of forces, are at the same time the periods in which *common property is multiplied*, not only that of the State, but also that of the most considerable social entities, *accentuating the subordination* of the individual life *to the collective ends.*" II-1 *Derecho Civil Español, Común y Foral* 92, 93, 94, 10th ed., 1964.

And see: *"La Propiedad y sus Problemas Actuales"*, 2d ed., *Instituto Editorial Reus*, 1963, Dissertation read by Don José Castán at the Solemn Opening of the Courts on September 15, 1962.

the requirements of the common welfare require a determination of what things may be delivered to individual control, especially in those economic sectors which are vital for humanity; and it requires that the *social element* be compelled to penetrate individual property, not only with respect to the fixing of limits to the extension and exercise of the right of property, but also imposing upon the proprietor those obligations and responsibilities which are demanded by the general interest, a consequence of the fault of the proprietor or of the notion of risk. Among the many concrete solutions in which he molds the present socializing orientation of the right of property, he points out:

(ii) Favoring the expansion and *resurrection* of the types of *common or collective property* as well as *exploitation by the State* or *by the Municipality* of certain important industries and of the public utilities . . . .

(iii) Limiting the exercise of the right of property to avoid its being used antieconomically or irrationally . . . .

(v) Limiting the power to *enjoy* and *dispose of*, and the entire contents of the right of property, with a full development of the rights *of the community and of the State* . . . .

(vi) Developing the principle and applications of "condemnation," extending them to certain movables, and *broadening the grounds for applying them with respect to immovables,* introducing beside the classical condemnation for works or constructions of public utility, condemnation on the ground of agrarian or other industrial benefits and improvements and in the *social interest. Op. cit.* pages 102–104.[12]

---

[12] The Spanish State has a comprehensive condemnation act, which is the Act of December 16, 1954. It provides for condemnation for causes of public utility "or of social interest." In addition to the State—Art. 2—the beneficiaries of condemnation on the ground of public utility may be the entities and concessionaires to whom this condition is legally acknowledged and, "*on the ground of social interest,*" aside from the ones aforesaid, *any* natural or juridical *person* who meets the requirements fixed by the special law and necessary for these purposes may be beneficiaries thereof.

Article 10 declares that public utility, with respect to the condemnation of immovables, is understood to be "*implicit*" in all of the "plans

In conformity with the Christian social fundamentals of property stated above, our Constitution recognizes as a fundamental right of the human being, the right to enjoy property. Article II, § 7.

But our Country has not fallen behind in modern thinking respecting the social utility of all property, public and private, which must in the first instance serve the common

for works and services of the State, province and municipality."

According to Art. 71, there is a right of condemnation on the ground of *social interest* in addition to the cases provided by law, *"when with this expressed meaning a law has specifically declared* that a property or a class of properties be used in the positive sense of a determined social function and the proprietor fails to comply with this directive."

Article 76 permits the condemnation of *movables* or *immovables* of an artistic, historical or archaeological value. (In the case of these artistic or historical properties, the price of the properties is to be fixed by Academicians, one of them in representation of the proprietor. Article 78.)

Article 82 permits the condemnation of buildings and lands that interfere with the contemplation of historic-artistic monuments, constitute cause of impairment of any kind to them, and all those which may destroy or lessen *the beauty* or safety of the *collection of historic-artistic interests.*

Article 85 *et seq.* permit the condemnation for reasons of urbanism. According to Art. 86, whenever it be necessary to condemn lands that are the principal basis of support of all or of the greater part of the families of a municipality or of a minor local entity, the Council of Ministers shall agree to the *removal of the population.* Article 97 permits this to be done on the ground of "colonization" and in the case of properties which are capable of improvement.

Whenever the *general interest advises the diffusion of an invention* or its exclusive use by the State, Art. 99 permits a condemnation of the *patent.* The remaining classes of industrial property are also declared subject to condemnation.

The Law permits the condemnation of temporary occupation, Art. 108 *et seq.*

In agreement with the foregoing, see the *Ley de Ayuntamientos* of June 24, 1955; the Law respecting Rules for the Soil and for Urban Order, May 12, 1956; Urban Planning, Urban Rules for Control of the Land, Execution of Plans of Urbanism; the Act of July 17, 1945, respecting condemnation for the benefit of *private* charitable institutions of learning. Law of April 27, 1946, on condemnation of rural properties which have a *social interest:*—Colonization; Decree of August 10, 1955, respecting *concentration of parcels*; Decree of June 12, 1953, respecting Trade in historic-artistic objects; Law of October 24, 1939, declaring an industry to be in the national interest in order to stimulate private initiative to establish it; Law of July 15, 1954, respecting the protection

interest and welfare. In many aspects of this social utility, our People have anticipated, or delved more profoundly into, what has happened in other countries. It is sufficient to look at the legislation presently in force in our statutes and codes.

Although it is true that our Condemnation Act of 1903 still speaks in terms of condemnation for reasons of "public utility" and enumerates a series of works, § 2—see § 3(a)—

of limited rent housing, and the respective regulations and decrees for the execution of these Laws.

See the Judgments of the Supreme Court of Spain of January 3, 1953 (Aranzadi: No. 102); July 4, 1957; October 10, 1957; February 10, 1930, and December 5, 1931 (respecting artistic or historic properties); March 20, 1952 (colonization).

In a Preamble to the Expropriation Law of December 16, 1954, Rodríguez Moro states as follows:

"Since 1879 it is no exaggeration to state that the political, social, economic and all other kinds of bases, which condition the action of the Government, have suffered displacement of such significance, that all of the institutions of the classical Administrative Law, even without becoming deformed in their technical scheme, have had to be readapted conveniently, for the purpose of being able to work with them as ideal means in the service of a significant and intensive administrative action very different from the action which was considered ideal in the period in which said law arose. With respect to *condemnation*, this becomes a more pressing matter precisely because it means a considerable sacrifice of the private interest, and this sacrifice of private interest is the point which resists *the growing exigencies of the public interest*.

"Within the field of action fixed by the liberal political order for condemnation proceedings, the principle of *social conscience* of the new State has acted, in the first place, . . . . In consecrating *condemnation for the social interest*, the fundamental law has juridically incorporated a concept which, having overcome the *bitter individualism* of the legal system of private property of the liberal economy, finds an *implicit social function in property*. Consequently, *condemnation* now has to be shaped from this new perspective, so as to afford the Administration *effective means* to execute the principles contained in the fundamental statute of rights and duties of the Spaniards." (Italics added.) Nemesio Rodríguez Moro: *"La Expropiación Forzosa,"* Institute of Political Studies, Madrid, 1958.

Also consult: García De Enterria: *"Los Principios de la Nueva Ley de Expropiación Forzosa",* Institute of Political Studies, Madrid, 1956; Alberto Almazor and Julio Rafels: *"Expropiación Forzosa y Urbanismo",* Barcelona, 1959.

it is nonetheless true that in 1946, by Act No. 300 of April 12, the Legislative Assembly amended for the first time § 282 of the Civil Code of 1902 to read as follows:

"No person shall be deprived of his ownership except it be by a competent authority, and for a justified purpose, public utility *or social benefit,* and upon payment of just compensation which shall be fixed in the manner provided by law." (Italics ours.)

The amendment inserted the underscored phrase "or social benefit."[13]

It is provided in the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico, Art. II, § 9, that private property shall not be taken or impaired "for public use" except upon payment of just compensation and pursuant to the form provided by law.

█ If we take into consideration the most advanced contemporaneous criteria respecting the duties and function of the State; the almost universally accepted fact of the social concept of private property; the social legislation adopted by the Legislative Assembly prior to the Constitution; the judicial interpretation of this legislation; the amendment in 1946 of § 282 of the Civil Code made by legislators of whom a great number were later members of the Constitutional Convention as delegates, it is necessary to conclude that the phrase "public utility" in the Constitution of the Commonwealth of Puerto Rico also means social utility, social interest, common welfare.

—V—

█ The power of condemnation of the Commonwealth is consubstantial with its existence as a State, and insepara-

---

[13] Likewise, in its new Civil Code of 1942, Venezuela amended the equivalent § 547 to provide that "No person can be obliged to give up his property, nor to permit others to have the use of it, except for public utility *'or social utility'* . . . ."

524

ble from its police power. The Constitution of Puerto Rico regulates this power in the sense that it is to be exercised for public utility and as we have concluded, social benefit and interest or utility and for the common welfare, subject to the payment of a just compensation; and in the case of a printing shop, it is furthermore regulated in other aspects. *Kohl et al. v. United States*, 91 U.S. 367, 372; *Boom Co. v. Patterson*, 98 U.S. 403, 406; *United States v. Jones*, 109 U.S. 513, 518; *United States v. Carmack*, 329 U.S. 230, 236, 237; *Reter v. Davenport, R.I. & N.W. Ry. Co.*, 54 N.W.2d 863, 867 (Iowa).

When the Legislative Assembly itself, which exercises the power of condemnation of the State either by itself or by delegation, makes the determination of the public utility or public interest, the power of the courts to contradict that determination is little less than imperceptible. For this to occur, as stated by Judge Holmes in *Old Dominion Co. v. United States*, 269 U.S. 55, 56, and ratified years later in *U.S. ex rel. T.V.A. v. Welch*, 327 U.S. 546, 552, the legislative determination must be equivalent to an impossibility or there must be a total inexistence of a rational connection between the legislative declaration and the object sought.

■ Once there has been a legislative declaration or a declaration by the delegated entity that there is public utility, within the present meaning of the concept, the courts cannot intervene with the manner and the means which the Legislature or its delegated entities choose to exercise the power of condemnation, nor with the selection made respecting what properties are to be condemned. *Berman v. Parker*, 348 U.S. 26, 33 *et seq.*; *U.S. ex rel. T.V.A. v. Welch*, *supra*; *United States v. Carmack*, *supra* at pages 242, 243; *Adirondack Railway v. New York State*, 176 U.S. 335, 349; *Little v. Loup River Public Power Dist.*, 36 N.W.2d 261, 265 (Neb.); *Pearl River Valley Water Supply Dist. v. Brown*, 156 So.2d 572, 578 (Miss.), *cert. denied*, 376 U.S. 970. See:

*McCormick* v. *Marrero*, 64 P.R.R. 250, 253 (1944); *Municipality* v. *Planning Board*, 68 P.R.R. 600, 603 (1948); *Commonwealth* v. *Fajardo Sugar Co.*, 79 P.R.R. 303, 310 *et seq.* (1956); *cf. Commonwealth* v. *Aguayo*, 80 P.R.R. 534, 575 *et seq.* (1958); *Commonwealth* v. *Heirs of Gautier*, 81 P.R.R. 565, 575 (1959); *cf. P.R. Telephone Co.* v. *Tax Court*, 81 P.R.R. 948, 968 (1960); *M. Mercado e Hijos* v. *Superior Court*, 85 P.R.R. 354, 359 (1962); *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F.2d 316 (1st Cir.), *cert. den.*, 329 U.S. 772.

■ Neither the trial court, nor counsel for the defendants-appellees find any public utility or purpose because the Administration, in making use of the powers granted it by Act No. 13 of 1962 in order to execute the purposes of the statute, did not point out any specific work: a school, a government building, bridge, highway or public road, a park, etc., to be performed on the properties condemned.

■ As a ground for dismissing the complaint because "no public necessity whatsoever that would justify the acquisition by the State of the properties of defendants" exists, the trial court concluded that the condemnation was not "for a specific purpose of public use" and instead, "for the general purposes and ends framed within the Act creating the Administration." The inference is inevitable: The court understood that the general purposes of Act No. 13 of 1962 and the ends sought by it are not of public utility.

The error was committed because the court lost sight of the fact that the defendants' lands are not being condemned as part of a mechanism to provide a *situs* or tract for a specific work. For this purpose, Act No. 13 was unnecessary. The State could condemn by the ordinary legislation.

In this case sight was lost of the fact that the *land itself* is the fountain and the object at the same time of the evil or the social-economic problem that the Legislative Assembly

desired to meet through this legislation, and by the creation of the Land Administration.

Even though the rule were in every sense to the contrary, and courts have ample discretion to adjudge and contradict the legislative criteria respecting public utility and necessity, assuming, we repeat, that we have such a function, on the facts of record, the judicial criterion could be no other than one of full concurrence with the legislative judgment.

Our judges, like our executive officers and legislators, as well as the most humble of the citizens in the community, also know of the problems of concentration of human beings in a growing city and its needs for public and social services; the problems of traffic and means of communication; of the basic necessity of family dwellings, and of the innumerable problems and adjustments which are characteristic of an economy that is not static.

They also know how unequal economic forces, when one of them is at a plain disadvantage vis-a-vis the power of the other, are unable to establish, by a neutralizing and balancing law, free prices in open competition, and instead profiteering, speculation and monopoly arises, and artificially fixed prices to the profit of the speculator.

They know that by reason of human nature itself, hand in hand with the altruistic investment or capital which creates sources of wealth and welfare and gives life, even though with the just right to a profit, there is a less altruistic speculating capital with purely selfish purposes and only for its own particular benefit.

The trial court was of the opinion, and the defendants-appellees emphasized it in their briefs, that Act No. 13 and its means and methods are not anything else but a mechanism in the hands of the State to freeze and regulate the price of land. If the freezing or regulation of prices of land produces a rational way to solve the problem under attack, there is nothing unconstitutional in it. Likewise, if in order

to remedy the evil the Land Administration has to become a dealer in lands, even if for the purpose of keeping them in reserve to provide for the future, and all of which is for a social benefit, there is nothing unconstitutional in it.

As remarked by Mr. Justice William O. Douglas, the State, if it so desires, may adopt a socialist economy; even though in order to do so, it must pay for the private property it converts to public use. *"The Anatomy of Liberty"* 87, Credo Series. And see: *Green* v. *Frazier*, 253 U.S. 233, 238 *et seq.*

For the reasons stated, we must conclude that:

■ i. Act No. 13 of May 16, 1962, is constitutional in all of its aspects, means and methods. It constitutes a legitimate use of the public power for the protection of what, for a community of 2,712,808* human beings struggling in a small territory of 3,435 square miles, is their most precious value for survival: living space.

■ ii. The creation of the Land Administration of Puerto Rico and the powers and faculties it exercises to execute the purposes and ends of Act No. 13 of 1962 are constitutional.

■ iii. The works, projects, powers, authority, and prerogatives of the Puerto Rico Land Administration, created and exercised for the execution of the purposes and ends of the Legislative Assembly perpetuated in Act No. 13 of 1962, are works, projects, powers, authority, and prerogatives invested with a public interest and of social benefit.

iv. The "Scope of the Project" of the Metropolitan Area of San Juan, submitted to the Planning Board by the Land Administration and approved by the Planning Board on January 23, 1963 (Plan, Appendix A), is invested with a public interest and is of social benefit.

---

* As of July 1967. For 1970, 2,896,873 are expected; for 1975, 3,217,816 and for 1980, 3,623,395. Facts from the Planning Board.

█ v. All acquisition of lands by the Administration with a view to complying with the provisions of Act No. 13 of 1962 is of public interest and of social benefit, for which condemnation proceedings may be used.

vi. The Commonwealth has the right to retain title of dominion over the properties herein condemned which it acquired on December 5, 1963; and it is entitled to enter immediately into the physical possession of said properties.

vii. The defendants-appellees spouses Rosso are entitled to a just constitutional compensation, as said just compensation may be fixed by the Judicial Power. *Cf. Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327; *United States v. New River Collieries*, 262 U.S. 341, 343.

viii. In view of the fact that in the course of this litigation reference has been made to the financial ability of the Administration to satisfy any judgment for just compensation to which the defendants-appellees may be entitled, it is declared that for the payment of said just compensation as it may be judicially fixed the good faith of the People of Puerto Rico is pledged, and the funds in the Public Treasury are available, independently of appropriations and private funds which the Land Administration may have at the time of fixing the compensation and when the just compensation becomes effective.—Condemnation Act of 1903, §§ 5(a); 5(b).

The judgment dismissing the complaint on the merits and vacating the title of property acquired by the Commonwealth on December 5, 1963, will be reversed; another judgment will be entered granting the relief demanded in the condemnation complaint, sustaining the dominion title acquired by the plaintiff Commonwealth, and the case will be remanded to the trial court which shall proceed to fix the just compensation defendants are entitled to receive for the condemnation of their properties.

Mr. Justice Belaval, Mr. Justice Hernández Matos, Mr. Justice Blanco Lugo, and Mr. Justice Dávila did not participate herein.

## APPENDIX "A"

August 29, 1962

Mr. Ramón García Santiago
Chairman
Planning Board of Puerto Rico
Santurce, Puerto Rico

My dear Mr. García Santiago:

The Land Administration of Puerto Rico, created by Act Number 13 of May 16, 1962, respectfully submits to the consideration of the Honorable Planning Board the present consultation with respect to its project for the development of the Metropolitan Area of San Juan, in conformity with the powers and duties of this Administration and for the purposes of carrying out the ends of the law creating it.

In the statement of motives of said statute among other things it is stated that:

1. That urban lands or lands with potentialities for urban development are monopolized and kept without use by their owners. That this creates an artificial shortage of land and raises the price of lands at a greater rate than that of the prices of other properties and staple commodities.

2. That the rapid rise in the price of land makes it impossible for persons of scarce or average means to construct their homes in adequate areas.

3. That because of the preference of the Puerto Rican family for an individual dwelling, the increase in the price of land compels excessive horizontal expansion of the towns and cities. This renders it more difficult and expensive to provide certain essential public services.

4. That the rise in the prices of land increases the overhead cost of industrial and commercial establishments and,

in consequence, their products are at a disadvantage in the competitive market, both local and outside of Puerto Rico.

5. The increase in the price of land precludes the implementation of the master plans and constitutes a serious problem in the adequate use of public funds.

6. That the excessive and disproportionate increase in the price of land should be avoided as soon as possible in the interest of the public.

7. That the disproportionate increase in the cost of land has rendered more expensive and more difficult two types of public works which are essential to the development and welfare of the residents of Puerto Rico: communication and public housing.

The Act furthermore declares, that it is the intention of the Legislative Assembly that the Administration promote, in a planned and efficient form the welfare, the economic liberty, and the social justice of the present and future inhabitants of Puerto Rico, by the acquisition, preparation, and effective use of new areas in any part of Puerto Rico. In this manner a better balance with respect to the necessities of future communities may be assured, in harmony with the economic and geographic situation; the historic values and the natural values of land, seashores, forests, and landscapes will be preserved, better conditions of health, safety and community, greater recreational facilities and greater and better essential services will be assured; the concentration of lands, for speculative purposes in the hands of any person will be prevented; and every type of project will be analyzed, by the Administration, together with state or federal agencies, municipal government or private entities.

To summarize, this would promote actions aimed at better use and exploitation of lands on the basis of more reasonable cost for the benefit of the welfare of the community, especially in towns and in the areas of potential urban development, creating adequate reserves of land to

aid in this form the Commonwealth of Puerto Rico to carry out its public policy of industrial, commercial, and housing development, to provide public services, so that there will be an orderly development in harmony with the regulatory plans, and to execute more effectively its responsibility of maintaining health, the safety, and the welfare of the inhabitants of Puerto Rico at the highest level compatible with the resources of the community.

In the same way, the law confers upon it powers and rights which may be necessary to enable this Administration to execute without exclusion of other inherent activities the following:

1. To acquire any right, interest or servitude in any property which is favorable to the development, exploitation, and preservation of open areas in a natural state, to protect bodies of water, to preserve soils and forests, preserve the beauty of landscapes destined to the public use, to protect the public from the effect of floods, and to facilitate the use and development of preserved areas for projects of public interest and especially those relating to the health, safety, and welfare of the inhabitants.

2. To dispose of that part of its immovable property that may be necessary, establishing in so doing, such conditions or limitations, with respect to its use and exploitation, that it may consider necessary and convenient.

3. To assure the performance of the purposes of this Law and to avoid that the ultimate use given to said property facilitate or tend to create or maintain conditions which are undesirable or adverse to the public interest.

4. The Land Administration may impose those restrictions, when it sells or in any other manner disposes of its property, which restrict the profits which, by way of price to be paid by the public will be earned by the acquirer respecting the land and all other costs of the project.

5. To develop projects for the rehabilitation of lands by drying, drainage, fill, irrigation or any other adequate methods of increasing the utilization of lands.

This Land Administration has carried out a study of the population factors, the economic factors, and of the use of lands in the Metropolitan Area of San Juan. On the basis of the same it has prepared a projection of the probable growth up to the year 1980 with the purpose of determining the necessity of lands to favor the anticipated growth.

Below we offer the basic data of said study:

In the past decade the Metropolitan Area of San Juan (including the municipalities of San Juan, Bayamón, Cataño, Guaynabo, Trujillo Alto, and Carolina) absorbed all of the populational growth of Puerto Rico. This is to say, that a population of 509,000 which existed in 1950 has increased to 648,000 in 1960. This populational growth was reached in a decade in which migration from Puerto Rico to other places was substantial. The entities concerned anticipate that migration from Puerto Rico will be significantly smaller. Estimates to this effect, taking into account the reduction in the migration of Puerto Rico and the present tendencies of growth of the Metropolitan Area, point to a considerable growth for this area. Anticipating the possible results of a balanced regional growth we reach the conclusion that the Metropolitan Area of San Juan probably will grow from 648,000 in 1960 to 863,000 in 1970 and 1,112,000 in 1980.

Although the demographic growth is one of the principal controlling factors of the demand for housing, it is necessary also to consider the economic growth as the family that desires to possess a new house should have the capacity to acquire it. This populational growth will be accompanied by a rapid increase in the income of families. In the Metropolitan Area of San Juan it is expected that the number of jobs will increase from 180,000 in 1960 to 254,000 in 1970 and 326,000 in 1980.

The significance of this growth in number of jobs is not so much in its quantitative aspects but rather because of the fact that the increase in these jobs will be registered in industries which are normally high wage industries and which use specialized labor. This means that the increase in jobs will be principally registered in occupations such as the professions, technicians, office jobs, salesmen, etc., which are of the highest class and which also enjoy the greatest compensation. Of the total increase in jobs foreseen for the next decade, 65% will take place in the manufacturing industry and 33% in the government, these being activities which use a great proportion of totally qualified employees.

Estimates to the effect on the implication of this growth in jobs and in the increase in income of families show that the growth in the number of families with income with an acquisitive power of $3,000 will be not less than 80,000 in the 1960 to 1970 decade. Concretely, it is estimated that in the Metropolitan Area of San Juan there were in 1960 some 50,000 families with income of more than $3,000 and it is estimated that the number of these families with a power of acquisition to purchase similar houses could be 130,000 in 1970, which represents an increase of 80,000. For 1980 the number of these families is estimated to be 206,000. Many of these families which are passing this level of income are young families, of the more specialized occupations, who will be entering the home market every year when they desire to buy their own homes. It is significant that in the Metropolitan Area of San Juan, the number of homes headed by men in the 20 to 25 year range, that is to say, by young people, was 20,800 in 1960. For 1970 it is expected that this number be already 42,000 and for 1980, 47,000. This implies a notable growth in the number of young couples who shall require new homes.

It is estimated that, purely by reason of populational factors and the formation of homes, the number of dwellings

occupied in the Metropolitan Area of San Juan will rise from 140,000 to 201,000 between 1960 and 1970 and by 1980 there will be 274,000.

The foregoing figures refer to occupied dwellings, but at all times there exist other additional dwellings which because of the mobility of families and other reasons may be unoccupied. As a question of reality, in 1950 the number of vacant dwellings was equivalent to 5% of the occupied dwellings. In 1960 the unoccupied dwellings were equivalent to 6% of the occupied ones and it is estimated that for 1970 and 1980, this percent of unoccupied dwellings may rise to 7 and 8% respectively. Taking into consideration both the occupied and unoccupied dwellings, it is anticipated that the total volume of dwellings in the Metropolitan Area of San Juan will be 216,000 in 1970 and 252,000 in 1975.

The estimates indicate some 70,000 houses more in 1970 than in 1960 and for 1980 some 80,000 more than in 1970. Nevertheless these figures do not represent the total construction that will be carried out in fact during the decade. The number of dwellings to be constructed should satisfy the actual demand which may be generated not only by the increase in the number of families but also by the increase in the number of those who will have the capacity financially to buy them as well as by reason of the demolition and conversions of the dwellings already existing.

Studies to this effect taking into consideration the growth of the number of families, the increase in income in those families, the diminishment of dwellings by elimination and conversion show that in the Metropolitan Area of San Juan it would be necessary to construct 80,000 private houses of the type that are sold in the present market and that between 1970 and 1980 some 90,000 additional ones will be required. It is significant that during the three years of 1960 to 1962 a total of 22,700 private dwellings were constructed, of which almost 8,700 were constructed last year.

Below is an explanation of how the populational and economic projections are reflected in the need for lands:

1. *Private dwellings*—An analysis carried out of the developments constructed in the Metropolitan Area of San Juan during the preceding decade demonstrates that the average density was a little more than 6 dwellings per cuerda. Taking into consideration the guidelines adopted in principle by the Planning Board, it has been estimated that this average density amounts to about 8 dwellings per cuerda. Therefore, the 170,000 dwellings which have to be constructed for 1980 will require some 20,700 cuerdas.

2. *Public housing*—In order to accomplish the objective which has been established for public housing of reducing to 14% in 1970 the number of families residing in the areas to be improved in the Metropolitan Area of San Juan it will be necessary to construct some 16,600 public housing units and to develop some 12,000 lots. At least an equal number of dwellings and lots will be necessary for 1970 and 1980. This total of 57,300 housing units and lots will require some 4,000 cuerdas.

3. *Industrial use*—For 1970 it is estimated that there will be a level of 44,000 jobs in manufacturing in the Metropolitan Area of San Juan, which assumes an increase of 17,000 jobs. For the decade between 1970 and 1980 it is expected that there will be an increase of another 17,000 jobs. The total of 34,000 jobs will require around 850 cuerdas.

4. *Other uses*—The economic and populational growth anticipated will doubtlessly bring about a greater demand for more and better public services and utilities and the development of a greater number of projects by private agencies. The principles of good planning indicate that thought should be given to an adequate use and disposition of the lands. In order to answer the requirements of this demand it is required in terms of land that it be necessary

to dispose of another 3,170 cuerdas in order to continue without interruption the construction of highways, hotels, business facilities, bathing resorts and parks, hospitals, government offices, and other projects of diverse nature.

5. *Total necessities*—The analysis made respecting the demand for lands for different uses and facilities of the community up to 1980 shows that, in the Metropolitan Area of San Juan, some 28,720 cuerdas will be necessary for the following public and private activities:

| Use | Cuerdas |
|---|---|
| Industry, tourism, and commerce | 1,030 |
| Educational and institutional | 580 |
| Recreational | 600 |
| Medical-hospital | 200 |
| Transportation and communication | 910 |
| Housing | 24,700 |
| Government offices | 460 |
| Others | 240 |
| Total | 28,720 |

Of this total of 28,720 cuerdas it is estimated that around 3,000 cuerdas were developed between 1960 and 1962. In consequence, the number of net cuerdas necessary up to 1980 will be around 25,720. The foregoing facts point out that the extraordinary growth that was undergone in the past decade will prevail.

During the decade 1950 to 1960 a total of 10,000 cuerdas were subdivided in the Metropolitan Area of San Juan, which in their majority were private and public housing and public projects. The foregoing figures show that an average of a little more than 14,000 cuerdas will be urbanized in each one of the decades from 1960 to 1970 and from 1970 to 1980.

Based on the facts offered above this Land Administration requests this Honorable Planning Board to approve the described program of integral development of the Metropolitan Area of San Juan and specifically that it approve the Scope of the Project of acquisition of lands according to the plan which is accompanied. The same graphically describes the geographic scope of the project of acquisition of lands in the indicated area, in which the Administration proposes, in a particular sense, to carry out works of public character or to execute other programs germane to the Act creating the Land Administration of Puerto Rico and, as an integral project, to prepare new areas for the urban development of the Metropolitan Area within the conditions that assure the best balance with respect to the needs of the future communities of the area, taking into consideration the standards dictated by our organic statute, especially Article 7(t), to assure in said area the highest conditions of healthfulness, safety, comfort, recreational facilities, and other essential services. All of this is projected in such a manner that it may channelize the projects of development in this zone in such a form that the same favor the use of the lands which are indicated in the plan in a planned and efficient manner.

Cordially,

(s) Felix Mejías
*Executive Director*

**Appendix**
JRV/ammg

I CERTIFY that the foregoing consultation is a true and exact copy of the original transmitted to the Planning Board of Puerto Rico.

(s) José C. Ramos Vázquez
*Legal Officer*

ESTADO LIBRE ASOCIADO DE PUERTO RICO

ADMINISTRACION DE TERRENOS DE PUERTO RICO

CERTIFICO: Que esta es copia fiel y exacta del documento original.

San Juan, Puerto Rico a 21 de enero de 1963

_Harry Maldonado_
SECRETARIO

ADMINISTRACION DE TERRENOS DE PUERTO RICO

AMBITO DEL PROYECTO DE
ADQUISICION DE TERRENOS
PARA EL AREA METROPOLITANA
DE SAN JUAN-29 DE AGOSTO DE 1962